LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641





LMH Consulting Services

Expert Witness Report

Prepared for

Attorney Glenda A. Smith

of the

Law Office of Glenda A. Smith, LLC

Exhibit A

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



## Contents

OVERVIEW: ..................................................................................................................... 3

QUALIFICATIONS: ........................................................................................................... 3

BACKGROUND: ................................................................................................................ 5

*Terry v. Ohio, 392 US 1, 19 n.16 (1968)* ........................................................................ 6

*Tennessee v Garner, 471 US 1 (1985)* ............................................................................ 7

*Graham v Conner, 490 US 386 (1989)* ........................................................................... 8

Law Enforcement's Takeaway and Training. ......................................................... 8

POLICE TRAINING: ......................................................................................................... 9

*National Consensus Policy* ............................................................................................ 10

*De-Escalation* ................................................................................................................. 12

*USE OF FORCE CONTINUUM* ...................................................................................... 13

OFFICER ANALYSIS: ..................................................................................................... 14

*Officer Ryon Warmack* .................................................................................................. 14

*Officer Jordan Batts* ...................................................................................................... 15

*Officer Drew Jones* ........................................................................................................ 21

FINDINGS: ...................................................................................................................... 26

*Officer's Actions* ........................................................................................................... 27

References: ...................................................................................................................... 30

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



RE: Case Number A2300979, The Death of Joe Frasure Jr

**OVERVIEW:**

I, Lawrence Hunter, was hired as an expert witness by Attorney Glenda Smith of the Law Office
of Glenda A. Smith, LLC, in the matter of the shooting death of Joe Frasure Jr. (DOB 6/3/94) by
members of the Wyoming (OH) Police Department (WPD). On January 30, 2023, at
approximately 0036 hrs. (12:36 am), the Hamilton County Police Dispatch Center received a call
of suspicious activity at an apartment building at 320 Durrell Ave, Wyoming, OH. The dispatch
center then dispatched Wyoming police to investigate a group of two or three persons
attempting to break into the residence. Wyoming police officers Drew E. Jones, Jordan D. Batts,
and Ryon A. Warmack arrived on the scene and began investigating. According to the press
release issued by the Hamilton County Prosecutor, Melissa Powers, two individuals, Joe Frasure
Jr. and his father, Joseph Frasure Sr. (DOB 5/27/70), were on the scene. These individuals, when
confronted by police, attempted to flee. Joe Jr. is said to have been behind the wheel of a
minivan. When officers approached, he placed his vehicle in reverse and drove into a tree in an
attempt to evade capture. Finding no escape route, he put his vehicle in drive and went
forward, attempting to flee the scene. At this time, Officers Jones and Batts fired their duty
weapons. The shots struck and fatally wounded Joe Jr.
 I was hired as an expert in the use of force to determine whether the actions taken by Officers
Jones and Batts were reasonable in accordance with established court decisions and best law
enforcement practices.

**QUALIFICATIONS:**

I retired from law enforcement in good standing in 2019 at the rank of captain from the
Waterbury Police Department in Waterbury, Connecticut. I spent 24 years in policing, most of
which were in a supervisory/management capacity. During my career, I interviewed numerous
suspects, witnesses, and officers. I received considerable training, including *Interview and*

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



*Interrogation, FBI LEEDA Internal Affairs Investigation, CT POST First Line Supervision,* and *CT POST Mid Manager Training*, to name a few. I also attended a class on *Discipline & Termination: Rules, Policies, and Procedures* presented by Van Meter & Associates of Columbus, OH. I taught several courses to police academy recruits and veteran officers for in-service training. These classes included *Defensive Tactics* (LOCKUP, Arrest, and Control), *Handcuffing, Implicit Bias, Human Behavior, Civil Complaints,* and *Internal Investigations* (for supervisors). Even in retirement, I taught the *History of Policing Until the Civil Rights Movement* and *Police Legitimacy* for academy recruits. I am also an adjunct professor of Criminal Justice and Management at a college in Connecticut. I am Force Science certified. Force Science is dedicated to using peer review and scientific methods to analyze critical incidents, especially in law enforcement. They aim to improve officers' training and actions when encountering critical incidents.

I served as the commander of the Professional Standards Unit. At that time, the Waterbury Police Department's Professional Standards comprised the Internal Affairs, Inspectional Services, and Training Divisions. Part of my responsibilities as captain and commander of the IA and Training Units was to ensure policies were up to date on best practices, current law, and court rulings. I was responsible for reviewing and investigating Use of Force reports (Response to Resistance) and when officers applied force within the scope of their duties. Furthermore, as a member of the IA team, I investigated allegations of excessive force complaints by citizens against officers. When officers used force, all department supervisors reviewed and analyzed those reports to ensure that officers adhered to state law, department policies, and procedures.

I have a PhD in Leadership with a concentration in Criminal Justice. I also have a master's in forensic psychology. Forensic Psychology is the intersection of psychology and the criminal justice system. It is a specialty in professional psychology characterized by activities primarily intended to provide professional psychological expertise within the judicial and legal systems. Practitioners of forensic psychology possess advanced knowledge and skills reflecting the intersection of legal theory, procedures, and law with clinical issues, practice, and ethics.

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



My compensation for this case was a $300 retainer and $100 per hour for case review and preparation. My fee will be $150 per hour if court testimony is required.

**BACKGROUND:**

To prepare for this case, Atty Smith sent me numerous videos, court documents, dispatch audio, the Wyoming (OH) Police Duty Manual, and other pertinent materials. I reviewed all materials provided by Atty Smith, with particular emphasis on the body-worn cameras, video-recorded officer interviews, Hamilton County press release, and crime scene photos.

This case involves the use of deadly force by duly sworn police officers. As such, it is necessary to establish the narrow parameters that the US Constitution, courts, state laws, policies, and procedures dictate law enforcers may use force. The force police officers may use and will be analyzed includes their mere presence and verbal commands and escalates up to and including the use of deadly force.

Law enforcement's problem is that it is and has always been decentralized rather than nationalized. That is, no governing body enacts codes of conduct, compiles data, establishes or oversees training requirements, and records or establishes policies for the entirety of policing (Crank & Langworthy, 1996). The Federal Bureau of Investigation (FBI) compiles data on several law enforcement issues, including the use of force and deadly force incidents by officers when performing their duties. However, participating agencies volunteer their information in an attempt to be transparent and add to the body of research involving law enforcement issues. In volunteering their information, police departments demonstrate a message of openness, transparency, and a willingness to build trust with the community and aid in research. Other benefits are understanding the national use of force data, current crime patterns and trends, and helping to solve and prevent crimes such as domestic violence, burglaries, and terrorism (FBI, 2023).

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



The only consistent measure of guidance offered to any organization is the Supreme Court of The United States (SCOTUS). The Supreme Court, based on its interpretation of the Fourth Amendment of the US Constitution, has established three seminal court cases that guide law enforcement in their application of the use of force, including the use and application of deadly force.

These cases are briefly discussed below:

*Terry v. Ohio, 392 US 1, 19 n.16 (1968)*

A police officer in Cleveland, Ohio, observed two men who, in his expert opinion, were acting suspiciously. The officer could not articulate precisely what drew these men to his attention. However, based on his training, experience, and knowledge of the area, he believed that some crime was occurring or about to be underway (afoot). The officer was assigned to the downtown Cleveland area to patrol for burglaries, robberies, pickpockets, and other crimes. According to the officer, he noted one of the men paced back and forth. At times, he would pause in front of a store, look through the window, and then walk back to the corner where the other waited. The other man would then perform the same actions. Walk suspiciously, pausing in front of the same store window, glance in through the glass, and proceed to walk back. He observed the men perform this routine several times. At one point, the men were joined on a corner by a third man whom they spoke with briefly. When the third man left the original two, they again performed their alternate routine of walking past and looking in the window of the establishment. Believing that the men were plotting to rob the business, the officer followed the men and confronted them on a neighboring street. Failing to get coherent responses, the officer spun one of the men around and performed a 'pat' down of his trench coat. Feeling what he believed to be a gun, the officer placed his hand into the coat and seized the weapon. The officer then performed the same type of pat down on the other men and retrieved a firearm from one of the men. As mentioned, this case was appealed to the Supreme Court, which eventually affirmed the officer's actions.

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



*Law Enforcement's Takeaway and Training.*

1. Courts recognize the training and experience that officers have received in their careers.

2. Officers should be able to articulate the actions that lead them to believe a crime is or is about to be committed. Before approaching a suspect, they must have a particular set of facts and actions that can be described as unusual based on the officers' training and experience.

3. The courts allow a limited amount of intrusion by an officer against a person to ensure the officer's safety during their encounter. The 'pat down' or 'Terry' stop is solely for officer protection, not a random fishing expedition for fruits of crime, paraphernalia, or other items.

4. Fruits of any crime gained from such a pat down will not be admissible, absent reasonable articulable suspicion of pending misconduct.

### Tennessee v Garner, 471 US 1 (1985)

In the Tennessee v Garner case, a Memphis police officer attempted to apprehend a suspected burglar. The suspect, Edward Garner, was seen fleeing the area on foot. Garner stopped at a fence. Using a flashlight, the officer saw the suspect's face and could perceive that he did not have weapons in his hands. Upon Garner climbing over a fence to elude capture, an officer fired his weapon and struck Garner in the head. Guided by Tennessee state law at the time, the officer fired his duty weapon at a fleeing felon despite believing that the suspect was a teenager of slight build and not seeing any weapon in his hands or having any reason to think he was armed. According to Tennessee law, officers were permitted to "use all the necessary means to effect the arrest." Upon appeals, the Supreme Court of the United States (SCOTUS) determined that the Tennessee law was not in line with the US Constitution.

*Law Enforcement's Takeaway and Training.*

1. Use of deadly force against a fleeing suspect cannot be used unless there is a potential risk that the suspect will cause serious bodily injury or deadly force if they escape.

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



2. Numerous departments throughout the country updated their policies to reflect the new standard set by SCOTUS.

**Graham v Conner, 490 US 386 (1989)**

This decision followed shortly after the Tennessee v. Garner decision and served as a principle guide in police officer use of force. Graham, who had diabetes, was feeling low on his blood sugar. He went into a store to purchase some orange juice. Upon seeing the long line at the cash register, he decided to leave and go to a friend's house who lived nearby. Officer Conner witnessed his behavior, believed it to be suspect, and seized Graham, restricting his freedom to leave. Despite pleas and explanations from Graham, Officer Conner and other backup officers detained him.

The SCOTUS determined that Connor's conduct was excessive and set boundaries to which law enforcement must now adhere.

**Law Enforcement's Takeaway and Training.**

1. Law enforcement must use objectively reasonable force when apprehending a suspect or performing a law enforcement purpose. Failure to do so would violate the Constitution's Fourth Amendment- right to be free from unreasonable seizures - and subject an officer to civil litigation.

2. The Court established a *reasonable* standard for seizing individuals. Officers will be judged based on what another equally trained officer would know and respond in a similar situation. Objective reasonableness is based on what the officer seeks to do rather than what others think or feel the officer's subjective intentions are. Essentially, the facts of the case and the officer's actions are judged rather than the subjective thoughts of an officer.

3. They established the *Totality of Circumstances test.* When an officer uses force, the entire scenario from the officer's point of view is considered. What the officer knew and perceived at the time of the incident will be a guiding factor.

4. Officers are trained to use a 3-prong test:

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



   a.  The severity of the crime.

   b.  Whether the suspect poses imminent harm to the officer or another person.

   c.  Whether the suspect is actively resisting or if the suspect is trying to escape.

      (Parker et al., 2016; Stephens, 2002).

**POLICE TRAINING:**

Thus far, the discussion has centered around the ideas set forth by the US Constitution and SCOTUS's interpretation of the Fourth Amendment concerning seizures, i.e., arrests, investigatory stops, and other detentions. The other facet that must be considered concerning an officer's decision to use deadly force, as in this case, is their training and department policies and procedures. I have not received the training manuals or materials, such as PowerPoints, lectures, etc., from the Wyoming Police Department (WPD). I have received the policies and procedures, particularly on using deadly force when officers are confronted with a suspect(s) inside a moving motor vehicle.

> *Wyoming Police Department*
> *300.4 DEADLY FORCE APPLICATIONS*
> *Use of Force*
> *300.4.1 MOVING VEHICLES*
>
> *Shots fired at or from a moving vehicle involve additional considerations and risks and are rarely effective.*
> *When feasible, officers should take reasonable steps to move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants.*
> *<u>An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the</u>*

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



*imminent threat of the vehicle, or if deadly force other than the vehicle is directed at the*
*officer or others.*

*Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.*

**National Consensus Policy**

In 2017, numerous professional organizations affiliated with law enforcement published a paper called the *National Consensus Policy and Discussion Paper on the Use of Force* (Consensus Paper) (IACP, 2020). A few of the organizations that signed on in support and collaboration with the paper are the Association of State Criminal Investigation Agencies (ASCIA), Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA), International Association of Chiefs of Police (IACP), Federal Law Enforcement Officer Association, National Organization of Black Law Enforcement Executives (NOBLE), just to name a few. Shortly after the death of George Floyd in Minnesota in 2020, the paper was updated to reflect current trends, models, and public demands for transparency and further restrictions on deadly use of force applications.

The *Consensus Paper* serves as a model policy that law enforcement agencies could/ should adopt and implement as their policy. Of course, agencies would need to make any adjustments to that model policy based on their own state, county, or city laws or charters. Agencies could also develop their own policy based on legal precedent and applicable laws.

The *Consensus Paper* addresses the use of deadly force involving occupants in a moving vehicle, which applies to this case.

> **National Consensus on Use of Force Policy**
>
> **IV. Procedures**
>
> **D. Deadly Use of Force**
>
> **3. Deadly Force Restrictions**
>
> *c. Firearms shall not be discharged at a moving vehicle unless*

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



> *(1) a person in the vehicle is threatening the officer or another person with deadly force by means **other than** the vehicle; or*
>
> *2) the vehicle is operated in a manner **<u>deliberately intended</u>** to strike an officer or another person, and all other reasonable means of defense have been exhausted (or are not present or practical), which includes moving out of the path of the vehicle.*

As one can see, the WPD Policy concerning shooting at a moving vehicle by police officers is at odds with the *National Consensus Policy* suggested by numerous professional law enforcement organizations. The Wyoming PD policy permits firing at moving vehicles <u>*when the officer reasonably believes there are no other reasonable means available to avert the imminent threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others*</u>. The *Consensus Policy* indicates that the vehicle must be operated in a manner that **intentionally tries** to strike the officer or another person.

The question must be answered: Did the officers involved in killing Joe Frasure, Jr. fire their weapons unnecessarily, or could they have found a different method to apprehend him? It is essential to understand that one of law enforcement's primary missions is preserving life. The Mission Statement of the WPD, which can be found on their official internet webpage and Facebook page, reads:

> *"The mission of the Wyoming Police Department, in partnership with the community, is to protect life and property, maintain order, and promote a safe environment through problem-solving, education, impartial application of the law, and the promotion of trust and mutual respect within our community."*

Therefore, it is established by WPD's mission statement their imperative is to preserve life. The first consideration is what was Joe Jr's intention. For obvious reasons, it is impossible to read his mind or know his exact reasoning on the night in question.

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



**De-Escalation**

In recent years, especially since the high-profile deaths of Michael Brown and George Floyd, critics and advocates have been calling for de-escalation training for police officers. Contrary to widespread belief, law enforcement has always embraced de-escalation in some form or another (Engel et al., 2020). In 2016, The Police Executive Research Forum (PERF) published *Critical Issues in Policing Series: Guiding Principles on Use of Force* (PERF, 2016). Taken from page 7 of the PERF publication:

> *"Several Hundred Officer-Involved Shootings Last Year Did Not Involve Subjects with Firearms Regarding non-firearm encounters, the Washington Post data indicate the following:*
>
> *• In approximately 25 percent of the 990 fatal officer-involved shootings in 2015, the subject displayed signs of mental illness.*
>
> *• In 16 percent of the cases, the subject was armed with a knife.*
>
> *• In 9 percent, the subject was unarmed.*
>
> *• In 5 percent, the subject was "armed" with a vehicle.*
>
> **It is in these types of cases, representing as many as one-third of the annual total of fatal officer-involved shootings, that leading police executives believe there is significant potential for de-escalation and resolving encounters by means other than the use of deadly force.**" (Emphasis theirs).

The police executives and policymakers believe that when individuals are armed with a vehicle, those encounters can be handled with less lethal alternatives.


The WPD Policy also calls for De-escalation when appropriate. From their Policy and Procedures:

> **Wyoming Police Department**
>
> **Policy 300 – Use of Force**
>
> **300.3.6 Alternative Tactics- DE-ESCALATION**

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



> *When circumstances reasonably permit, officers should use non-violent strategies and*
> *techniques to decrease the intensity of a situation, improve decision-making, improve*
> *communication, reduce the need for force, and increase voluntary compliance (e.g.,*
> *summoning additional resources, formulating a plan, attempting verbal persuasion).*

The National Consensus paper, as mentioned above, states:

> ***National Consensus on Use of Force***
>
> ***Use of Force***
>
> ***IV. Procedures***
>
> ***B. De-escalation***
>
> *1. An officer shall use de-escalation techniques and other alternatives to higher levels of*
> *force consistent with his or her training whenever possible and appropriate before*
> *resorting to force and to reduce the need for force.*

Police executives and policymakers dictate that officers should not fire their weapons at moving cars but move out of the way whenever possible.


**USE OF FORCE CONTINUUM**

The National Institute of Justice has recognized a force continuum for law officers. That is, there is or should be a progression in the escalation and de-escalation in the application of force when dealing with suspects. That continuum is:

- Officers' mere presence (Officer in uniform, i.e., merely being called to a scene)
- Verbal commands – giving orders (Hands up, stop moving, etc.)
- Empty hand control – grabs, control holds
- Less-Lethal – chemical agents, electronic devices (TASER), blunt instruments (nightstick, batons)
- Lethal Force – firearm or other weapon designed to drastically stop an individual's actions. (NIJ, 2009).

**LMH CONSULTING SERVICES**
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



Officers can escalate or de-escalate up or down on the continuum based on the scenario and level of resistance the suspect(s) offers. For example, in a scenario where someone waves a gun and threatens another, officers do not have to start at the lower rung of the continuum. They may go straight to using deadly force to stop the threat. Conversely, the same individual wielding a weapon may suddenly rethink their action, drop their weapon, and become compliant. In that scenario, officers should lower their force levels; in such a case, verbal communication and the placing of handcuffs may suffice.

The IACP also recognized the difficulty in balancing public and officer safety, especially in dealing with the use of force continuum and officer safety. In a paper dealing with executive decisions and reviews of use-of-force incidents, experts acknowledge the need to look at an incident pre-decision, mid-decision, and post-decision use of force (IACP, 2012). That is, what led up to the use of force and what officers can learn from past incidents to guide future apprehension techniques.

**OFFICER ANALYSIS:**

*Officer Ryon Warmack*

When officers arrived on the scene, body-worn cameras (BWC) video details what occurred. Close to the time of the event, BWC Axon Body 3 X60311664, worn by Officer Warmack, shows him walking on the right side (when viewed from the street) of the building suspected of being burglarized. He hears noises coming from the backyard and yells, "Back!". He is indicating to the other officers on the scene that something is occurring in the rear of the house. From here, we can see and hear him running toward the rear and see Joe Sr standing outside the passenger door and Joe Jr sitting in the minivan's driver's seat. Warmack orders Joe Sr to put his hands up, to which Sr complies. After his hands enter the air as ordered, we hear the minivan engine start. Upon hearing the engine start, OFC Warmack raises his firearm to force Joe Jr, the minivan operator, to comply with his orders of "Stop!". It is unknown whether Joe Jr, sitting in

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



the driver's seat, could hear the officer's commands or see his firearm due to the high-powered flashlight(s) being pointed at him. The flashlights can have a temporary blinding effect when pointed at suspects.

Analysis of the video indicates that OFC Warmack is running directly in front, toward the hood and grill of the vehicle. However, instead of putting the vehicle in drive and driving toward the officer, Joe Jr puts the car in reverse and drives backward, attempting to escape. He drives the vehicle in reverse and strikes a tree or thick bushes. When unable to escape that way, Joe Jr shifted the minivan in drive and attempted to evade capture by driving toward the paved driveway out of the backyard.

When the vehicle is put in drive, Officer Warmack wisely steps out of the path of the moving vehicle. Joe Jr then drives toward the paved driveway to escape. The vehicle's horn could be heard after Joe Jr had driven past Officer Warmack. It is unknown whether that was an accident or if Joe Jr deliberately blew his horn to warn officers to move out of the way. OFC Warmack did not fire his duty weapon even though he was closest to the vehicle. Warmack simply moved out of the way.

### *Officer Jordan Batts*

Officer Batts's BWC, wearing Axon Body Cam 3 X60317296, indicates that he was walking on the left side of the home when this incident began. For a short time, he and OFC Drew Jones, who is also standing near him, are listening to possible noises coming from inside the building at 320 Durrell and conversing (whispering) with each other. They walk to the front of the home and listen for a while with OFC Warmack. Officer Warmack then walks toward the right of the building, on the paved driveway toward the backyard. Soon after, Warmack yells, "Back!" and begins to run that way. Officers Jones and Batts then run and follow Warmack. Upon nearing the rear of the house, Image 1 shows that Joe Sr is complying with orders to place his hands in

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



the air. The video also shows OFC Batts raising his firearm threateningly to gain compliance and prepare for engagement. Image 1 is from OFC Batts BWC's viewpoint.

Image 1



The image shows compliance by Joe Sr and OFC Batts, with his gun drawn and lights pointed inside the vehicle operated by Joe Jr. Video footage demonstrates that Officer Warmack went toward the vehicle as it backed away from officers.

Officer Batts BWC indicates that he also went further into the backyard as the vehicle attempted to flee. We hear OFC Batts telling Ryon (OFC Warmack) to be careful and back up. When the vehicle is put in drive, we see Officer Batts turn and run toward the driveway, where Joe Jr was heading. The next still image (Image 2) that I captured from the video indicates the moment when OFC Batts is telling Ryon Warmack to back up.

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



Image 2



Image 2 shows OFC Batts's weapon raised in a ready-to-shoot manner. Along with his raised firearm is a high-powered flashlight aimed directly at Joe Jr or the passenger compartment. Due to the glare from the flashlights, it is impossible to see OFC Warmack. He is standing on the left (driver's side) of the vehicle. At this moment, OFC Batts uses excellent judgment and does not fire his weapon. There are two options as to why he did not fire. Either he did not believe OFC Warmack was in grave physical danger, or he was worried about missing his intended target and accidentally shooting his partner. OFC Batts then turns and runs and does not turn back around until he is off the pavement or near the edge of the grass of the adjacent building on the property directly to the right (view from the street) of the occurrence.

The subsequent frames (Images 3 & 4) showed that Warmack was not in physical danger.

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



Image 3



Image 4



LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



Image 5 demonstrates that any suspected or perceived danger to OFC Warmack was passed. It also shows that OFC Batts was finished running and turned around to engage with the vehicle. It is unknown why OFC Batts did not continue running rather than turn to engage. He also could have veered out of the path of the vehicle.

In Image 5, OFC Batts is standing on or near the adjacent building's grass and no longer on the driveway. Drew Jones, the third officer on the scene, is on the grass and close to the 320 Durrell Ave building.

Image 5



The next photo (Image 6) demonstrates that OFC Jones fired his weapon while on the grass, and his personal safety was not in danger, nor was OFC Warmack's from the vehicle.

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641





Image 6

As can be seen, OFC Jones is firing while he is on the side of the vehicle.

The following still (Image 7) is taken from OFC Batts BWC while he is firing his weapon. We can see the driver-side front tire steering away from Batts to avoid striking him. The minivan maintains contact with the paved driveway and attempts to evade capture. Image 7 also shows that Batts is firing while he is on the side of the vehicle.

Image 7

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



In his video-recorded statement to Hamilton County Sheriff's Detectives, OFC Batts indicates that he turned to face the vehicle. Around the 11-minute mark of the interview, OFC Batts suggests that he decided to turn and face the encounter. OFC Batts's decision to turn around rather than move out of the way contradicts the WPD policy and best law enforcement practices, indicating that officers move out of the way.

### Officer Drew Jones

Officer Drew Jones wears the third BWC for analysis, Axon Body 3 X60317846, showing his view of the scenario unfolding. From the time OFC Warmack yells "Back!" we see (Image 8) OFC Jones draw his weapon and run toward the rear of 320 Durrell Ave.



Image 8

Video footage and Image 9 show OFC Jones radioing in the situation. He is relaying to dispatch and other officers who are listening that a vehicle is on scene and is taking off, and one (suspect) is at gunpoint.

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



Image 9



Image 10 shows the minivan driving toward the escape route, wheels turning toward the asphalt. At this time, we see OFC Batts running away while the horn can be heard blowing. The same still shows Batts running away as the horn is blown and the vehicle's direction is going toward the pavement.

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



Image 10 (**Horn is being blown at this time**)



As I mentioned earlier, it is unknown why the horn was blown, but Joe Jr might have been trying to tell officers to move so they would not be struck.

Image 11 shows the approximate moment OFC Jones fired his weapon. The image shows that Jones fired while on the side of the minivan.

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641





Image 11

Image 12, still frame, shows the aftermath. The shots have been fired, and the vehicle comes to rest. OFC Jones is moving off the grass and onto the driveway, with OFC Batts also moving toward the vehicle.

Image 12



LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



The video footage shows that OFC Drew was clearly on the grass on 320 Durell, and OFC Batts was either entirely on or near the edge of the grass of the adjacent building to the right (from the street view) of 320 Durell Ave.

The final still frame is taken from OFC Drew's BWC. It shows a small hill leading toward the adjacent building. This is the general area that OFC Batts was running toward before he turned around. If OFC Batts believed he was about to be struck by the minivan, he could have continued running down that hill toward the garage doors and off the pavement. No fence or high wall prevented Batts from moving out of the minivan's path.

Image 13



### Drew Jones Interview

Officer Drew Jones provided a statement which the Hamilton County Sheriff's Department recorded. OFC Jones made some significant statements during the interview with Hamilton County detectives. Around the 12:22 mark of the video, Jones indicates that he yelled to OFC Warmack to get back because he knew what would happen. Yet, OFC Jones does not fire his

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



weapon. At 13:48, OFC Jones stated that while the van was egressing from the rear, he (Jones) was "in a pretty okay spot." Meaning that he believed he would not have been struck by the minivan. At 13:55, OFC Jones states that he saw the minivan cut the corner. In other words, the minivan turned toward the street, attempting to flee from officers rather than strike them. This indicates that he believed that the operator was trying to escape and not cause any harm to him or his partner standing to the right. At 14:03, he again indicates that he is in a good spot. Around 14:45, OFC Jones stated that he lost track of the exact location of OFC Batts. OFC Jones says he fired his weapon, believing his partner, Batts, would be struck by the minivan.

The above information is vital because it informs us that OFC Jones was making critical calculations. He chose not to fire when he feared OFC Warmack would be struck. Yet, without knowing the precise location of his other partner, Batts, Jones fired his weapon. At that point, Jones had no idea whether Batts was in a safe position. Furthermore, OFC Jones risked a potentially dangerous crossfire scenario because he did not know whether OFC Batts was actually in danger or his exact location.

**FINDINGS:**

This report analyzed the actions of Wyoming, OH, police officers Ryon Warmack, Jordan Batts, and Drew Jones on the night of January 30, 2023, at 320 Durell Ave, Wyoming, OH.

The Body Worn Camera (BWC) videos show the officer's actions. In connection with the above consensus of the policymakers and police executives from multiple law enforcement disciplines and organizations, the officers failed to take the necessary steps to preserve life, as their department mission statement declares.

Having worked in patrol for the vast majority of my career, I understand the difficulties of making split-second decisions and the frustrations of having those decisions critiqued by experts and courts. It is recognized that "officers are forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving" (Grahm v Conner, 1989). I

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



recognize the difficulties of making decisions in the dark and being unsure of the motivations of individuals operating motor vehicles. However, after-action reports and expert analysis only improve officers and law enforcement overall.

It is my expert opinion that Officers Drew Jones and Officer Jordan Batts used force in excess of best practices and national standards. All three officers could have used more wisdom in de-escalation techniques.

*De-escalation*

- When Joe Jr put the vehicle in reverse, Officers Warmack and Batts ran up to the car with guns drawn. That act added to the exigency and heightened state of thinking instead of attempting to calm things down.
- Keep in mind that with weapons drawn, this situation is already at the lethal force level. A better approach may have been to hold their ground, slowly walk toward the vehicle, or seek cover if they feared the occupant(s) would suddenly exit the vehicle with weapons.
- Officers Jones and Batts had their weapons drawn before seeing any potential problem or the need for deadly force. To be sure, it is not an uncommon tactic for officers to pull their weapons in a possible burglary situation. However, with hindsight, we know that officers were responding to a suspicious person's call. Officers responding with their weapons at the ready seems excessive, especially in today's law enforcement climate. A better approach may have been to get to the backyard, slowly round the corner, and assess the situation with their hand on their holstered weapons.

**Officer's Actions**

As mentioned, the officers' actions pushed the level of the rapidly evolving situation. I recognize that events are occurring quickly, and officers must make split-second decisions; however, a few items must be considered.



LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641

- Officers should have recognized that Joe Jr's first instinct was to evade capture. Joe Jr initially tried to drive backwards and away from the officers.

- When Joe Jr put the minivan in drive to go forward, OFC Batts was disciplined enough not to fire his weapons despite his partner being close to the minivan. Indeed, all the officers exercised discipline and training by not firing their weapons at that time.

- It is possible that Joe Jr blew his horn to warn officers to move out of the way.

- OFC Batts could have kept running down the slight hill to safety. Furthermore, he could have veered off to the left to avoid the vehicle. His turning around to confront the situation was not the best decision, nor was it in line with de-escalation philosophy.

- BWC footage from Batts and Drew indicates that they both fired their weapons while on the minivan's side (see Images 6 & 7 and their BWC footage). Both officers fired at approximately the same time, thus creating a friendly crossfire situation, endangering both officers.

- Best practice suggestions from professional organizations indicate that police officers do not fire their weapons into or at moving vehicles unless the operator deliberately intends to strike the officer or another person. I believe this was not the case based on Joe Jr's actions. Joe Jr initially backs away from officers, and then, when driving forward, we hear the horn blow. Finally, it appears that Joe Jr was going toward the asphalt to escape from the backyard to the street. If Joe Jr was trying to strike Batts, He could have followed him onto the grass rather than making the right turn to get to the asphalt.

- Crime scene photos DSC 118, DSC 119 & DSC 120 indicate that the minivan was already veering toward the asphalt escape route.

- At no time was Warmack or Jones in danger of being struck. In my opinion, Batts and all officers could have or should have moved out of the way and stayed on the side of the vehicle. Firing their weapons subsequently killed Joe Jr. The killing of Joe Jr is what the WPD mission statement and PERF's guides on the use of force stand against. Batts

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



turning to engage rather than moving out of the way or continuing running toward the

adjacent property were actions that precipitated Joe Frasure Jr's death.

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



**REFERENCES:**

Crank, J., & Langworthy, R. (1996). Fragmented centralization and the organization of the police. *Policing and Society: An International Journal of Research and Policy, 6(3),* 213-230.

Engel, R. S., McManus, H. D., & Herold, T. D. (2020). Does de-escalation training work? A systematic review and call for evidence in police use-of-force reform. *Criminology & Public Policy*, *19*(3), 721-759.

FBI (2023). National Use of Force Collection Data. *FBI* https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/ucr/use-of-force

IACP (2020, July). National consensus policy and discussion paper on the use of force. *IACP h*https://www.theiacp.org/sites/default/files/2020-*0*7/National_Consensus_Policy_On_Use_Of_Force%2007102020%20v3.pdf

IACP (2012, March). Emerging use of force issues. Balancing Public and Officer Safety *h*https://www.theiacp.org/sites/default/files/2018-*0*8/emerginguseofforceissues041612.pdf

National Institute of Justice (2009, Aug, 3). The Use-of-Force Continuum. *NIJ.* nij.ojp.gov:https://nij.ojp.gov/topics/articles/use-force-continuum

Parker, M. M., Cleere, K., & Smith, K. (2020). In Search of an Objective Risk Continuity Assessment: Developing an Objective Assessment for Police Deadly Force Encounters. *Social Development Issues (Social Development Issues)*, *42*(1).

PERF (2016, March). Critical Issues in Policing Series: Guiding Principles on Use of Force. https://www.policeforum.org/assets/30%20guiding%20principles.pdf

Stephens, D. (2002). Police discretion and the use of force. A study of the use of force among law enforcement officer in Brevard County. *IACP* https://www.theiacp.org/sites/default/files/all/p-r/Police_Discretion_and_Use_of_Force.pdf

LMH CONSULTING SERVICES
HUNTERPOLICETRAINING.COM
HUNTERPOLICECONSULTING@GMAIL.COM
203-518-9641



Tennessee v Garner, 471 US 1 (1985). Justia US Supreme Court.

https://supreme.justia.com/cases/federal/us/471/1/

Terry v. Ohio, 392 US 1, 19 n.16 (1968). Justia US Supreme Court.

https://supreme.justia.com/cases/federal/us/392/1/