# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JOSEPH FRASURE, *et al.*,　　　　　　　Case No. 1:24-cv-92
　　　Plaintiffs,　　　　　　　　　　　Litkovitz, M.J.

　　　vs.

CITY OF WYOMING, OHIO, *et al.*,　　　**ORDER**
　　　Defendants.

Plaintiffs Joseph Frasure and Lisa Fischer filed this action under 42 U.S.C. § 1983

following the shooting death of their 28-year old son, Joe Frasure, Jr. (the "decedent"), by City

of Wyoming police officers.  This matter is before the Court on the cross-motions for summary

judgment and related memoranda filed by plaintiffs and defendants the City of Wyoming (the

"City"), and police officers Ryon Warmack, Drew Jones, and Jordan Batts.  (*See* Docs. 48[1], 49,

58, 61, 62, 63, 64, 66, and 69).[2]

## I.　　Factual Background

### A.　　320 Durrel Ave., Wyoming, Ohio

Julie Coleman, the decedent's grandmother, lived in a top unit of a two-story, four-unit

apartment building at 320 Durrell Ave. in Wyoming, Ohio ("320 Durrell") until she died on

January 6, 2023.  (Frasure Dep., Doc. 44-1 at PAGEID 925-31[3]; Fischer Dep., Doc. 45-1 at

PAGEID 1101-02)  During the afternoon of January 29, 2023, plaintiff Frasure and other family

members of the decedent were at 320 Durrell to clean out Ms. Coleman's apartment.  (Frasure

---

[1] Plaintiffs moved for summary judgment on Counts I-III of their complaint.  (*See* Doc. 48).
[2] These filings include defendants' supplemental motion for summary judgment and related briefing because the amended complaint was filed after the parties' initial summary judgment motions.  (Docs. 63, 66, and 69).  The primary purpose of the amended complaint was to substitute defendant Jones in place of defendant Batts in plaintiffs' second claim.  (*See* Doc. 57 at PAGEID 2030 (Supplemental Order Granting Motion to Amend)).
[3] During plaintiff Frasure's deposition, he mistakenly states the year of death is 2022.  (*Id.* at PAGEID 925, 49:22).

Dep., Doc. 44-1 at PAGEID 938-39). Several City police officers were in the vicinity of 320 Durrell during that afternoon. (*Id.* at PAGEID 939-40; Fischer Dep., Doc. 45-1 at PAGEID 1148-49).[4] At around 11:45 p.m. that night, plaintiff Frasure and the decedent returned to 320 Durrell to continue cleaning out Ms. Coleman's apartment because the landlord wanted it emptied, and plaintiff Frasure was under the impression that it needed to be cleaned out to have the deposit money returned. (Frasure Dep., Doc. 44-1 at PAGEID 942-44).

      B.      <u>Call, dispatch, and initial investigation</u>

Just after midnight on January 30, 2023, Jerome Guest called what he believed to be a City non-emergency line. Mr. Guest reported he lived next to an apartment building located at 320 Durrell that was supposed to be vacant, but he observed people walking around it "doing maybe suspicious things" during the late hour. He reported he could see people walking around in the windows and flashlights in the basement. When asked how many people were attempting to break in the home, Mr. Guest reported two or three, but he could not give a description, seeing only silhouettes in the window. (Doc. 9-1, Ex. C (audio recording of Mr. Guest's call)). The following image is a copy of an aerial photograph, in which 320 Durrell is the building on the left/west side of the driveway between the two buildings, and 322 Durrell is on the right/east side. (Illing Aff., Doc. 49-21 at PAGEID 1973, ¶¶ 13-14).

---

[4] It their motion for summary judgment, plaintiffs state "[plaintiff] Fisher and Arthur ([the decedent's] uncle) went to the Wyoming Police Department (WPD) to state, among other things, the family would be cleaning out their mother's apartment located at 320 Durrell in Wyoming, Ohio." (Doc. 48 at PAGEID 1486). In fact, plaintiff Fisher testified that she overheard her brother Arthur tell an unidentified employee of the Wyoming Police Department that Ms. Coleman's family members would be removing her stuff, but Arthur did not identify a date or time that this would occur. (*See* Fisher Dep., Doc. 45-1 at PAGEID 1107-08).



The Hamilton County Communications Center dispatched the call as "a group of two [to] three subjects attempting to break into the vacant residence." (Doc. 9-1, Ex. D (audio recording of the dispatch)). When asked about a "description," the dispatcher stated that the caller was unable to provide a description and could only see silhouettes. (*Id.*). Defendants Warmack, Jones, and Batts (collectively, "the Officers") were on-duty City police officers at that time and responded to the dispatch. (Warmack Aff., Doc. 49-4 at PAGEID 1609-10, ¶¶ 7-9; Jones Aff., Doc. 49-5 at PAGEID 1618, ¶¶ 8-10; Batts Aff., Doc. 49-6 at PAGEID 1626-27, ¶¶ 7-9). Each had a body worn camera (BWC) and other indicia of being a police officer (e.g., badge, uniform, etc.). (*See id.*).

Defendants Warmack and Batts had heard that an elderly tenant of the building had recently died prior to the events at issue. (Batts Aff., Doc. 49-6 at PAGEID 1627, ¶ 10; Warmack Dep., Doc. 49-7 at PAGEID 1644). In addition, the Officers were otherwise

previously aware of 320 Durrell from prior dispatches (Warmack Dep., Doc. 49-7 at PAGEID 1643; Batts Dep., Doc. 49-8 at PAGEID 1667-68)—including prior thefts, break-ins, and a drug-related shooting (Jones Dep., Doc. 49-9 at PAGEID 1690).

Defendant Warmack was the first to arrive at approximately 12:41 a.m. (*See* Warmack BWC[5]). Defendant Warmack approached from the east by foot and walked down the driveway between the two buildings. (*See* BWC at 00:41:00-42:27). In the paved area behind 320 Durrell, a van, another vehicle, and various debris are visible. (*Id.*; Warmack Aff., Doc. 49-4 at PAGEID 1610, ¶ 13). Defendant Warmack then turned, walked back up the driveway toward the street, and went to the front door of 320 Durrell. (*Id.* at 00:42:47-43:05). A light was on in the bottom right unit. (*See id.*). Defendant Warmack averred that he also observed lights in an upper apartment and in the basement, and he saw shadows in the front right/lower level unit of the building. (Warmack Aff., Doc. 49-4 at PAGEID 1610, ¶¶ 12, 14). Defendant Warmack attempted to open the front door to the building, but it was locked. (Warmack BWC, 00:43:00-43:03; Warmack Aff., Doc. 49-4 at PAGEID 1611, ¶ 15).

Meanwhile, defendants Jones and Batts had arrived at 320 Durrell at approximately the same time as defendant Warmack had arrived and approached from the west by foot. (Jones and Batts BWCs, 00:41:00-41:34). Defendant Batts and Jones observed lights on in an upper apartment, lower apartment, the central part of the building, and the basement and observed people in an upstairs unit. (Jones Aff., Doc. 49-5 at PAGEID 1619, ¶ 13; Batts Aff., Doc. 49-6

---

[5] The Officers' BWC footage was submitted by plaintiffs and defendants. (*See* Doc. 9-1, Doc. 50). The information stamp in the top right corner of each video reflects the date, time, and BWC number. Defendant Warmack is X60311664; defendant Batts is X60317296; and defendant Jones is X60317846. (*See id.*; Warmack Aff., Doc. 49-4 at PAGEID 1610, ¶ 9; Jones Aff., Doc. 49-5 at PAGEID 1618, ¶ 10; Batts Aff., Doc. 49-6 at PAGEID 1627, ¶ 9). Each recording covers virtually the same time period.

at PAGEID 1628, ¶¶ 12-13). Defendant Batts and Jones moved to a tactical position on the west side of 320 Durrell, and defendant Jones attempted to get more information about which apartment Mr. Guest identified without success. (Jones BWC, 00:41:53-43:08; Batts Aff., Doc. 49-6 at PAGEID 1628, ¶ 13; Jones Aff., Doc. 49-5 at PAGEID 1619, ¶ 14).

Defendants Batts and Jones heard voices from inside (Batts and Jones BWC, 00:42:33-42:35 (voices audible); Jones Aff., Doc. 49-5 at PAGEID 1619, ¶ 15; Batts Aff., Doc. 49-6 at PAGEID 1628, ¶ 14). Defendant Jones also described hearing a "bang" (Jones Aff., Doc. 49-5 at PAGEID 1619, ¶ 15), arguing or trouble, and one of the voices inside acknowledge the presence of law enforcement (Jones Dep., Doc. 49-9 at PAGEID 1696, Jones BWC, 00:42:17-31).

Defendants Jones and Batts moved towards the front of 320 Durrell, where an individual in the top right unit looked out the window towards the Officers. (Batts BWC, 00:43:21-43:23 (individual looks out window)). (Batts Aff., Doc. 49-6 at PAGEID 1628, ¶ 14). Defendants Batts and Jones then continued around to the front door of 320 Durrell, which defendant Jones found locked just as defendant Warmack had. (*Id.* at ¶ 15; Batts BWC, 00:43:37-43:40). Defendant Jones had been to 320 Durrell "multiple, multiple times" prior and it "had never been locked." (Jones Dep., Doc. 49-9 at PAGEID 1697, 41:7-8). While trying to open the front door, defendant Jones "saw someone running down the steps" and pass by the front door's glass. (*Id.* at 41:2-5). As defendant Jones walked to the front door, defendant Batts asked, "you wanna order 'em out? We can order 'em out, their window's open, Drew," but defendant Jones did not respond. (Batts BWC, 00:43:38-43:43). Just after, what sounds like a child's voice is audible. (Batts BWC, 00:43:43-43:46).

At around this time (around 12:43-12:44 a.m.), all three of the Officers were near the

front door of 320 Durrell.  Defendant Warmack then began to head back down the driveway of 322 Durrell (located between 320 and 322 Durrell) to the back of 320 Durrell.  (Warmack BWC, 00:43:28).  When defendant Warmack was partially down the driveway, he said, "back[,]" and quickened his pace.  (*Id.* at 00:43:49-43:52).  Defendants Jones and Batts heard this and perceived defendant Warmack's voice to be strained or urgent.  (Jones Aff., Doc. 49-5 at PAGEID 1619, ¶ 16; Batts Aff., Doc. 49-6 at PAGEID 1628, ¶ 16).  Within seconds, defendant Jones and Batts started to run down the driveway along the east side of 320 Durrell towards defendant Warmack.  (Jones and Batts BWC, 00:43:51-43:59).  Until this point, none of the Officers had announced themselves.  (*See generally* Warmack, Batts, and Jones BWC, 00:41:00-43:51)

### B.   Uses of force

#### 1.   *Defendant Warmack's perspective*

As defendant Warmack reached the back end of the building, he encountered plaintiff Frasure, shouted "hey," and commanded plaintiff Frasure to stop and place his hands in the air. (Warmack BWC, 00:43:52-43:56; Warmack Aff., Doc. 49-4 at PAGEID 1611, ¶ 16).  Plaintiff Frasure initially placed his hands up and repeated "I ain't going nowhere" (Warmack BWC, 00:43:54-43:58) but subsequently dropped them to near his waistband, causing defendant Warmack to repeat his commands.  (*See* Warmack Aff., Doc.49-4 at PAGEID 1611, ¶ 17.).  The following screenshots are from defendant Warmack's BWC at 00:43:54 and 00:43:56 a.m., respectively:





Plaintiff Frasure then placed his hands in the air, where they stayed until he goes out of frame. (Warmack BWC, 00:43:57-44:00). Mr. Guest, still in a neighboring building, could hear defendant Warmack's loud, urgent commands, which left him sure that they were issued by a police officer. (Guest Aff., Doc. 49-14 at PAGEID 1846, ¶ 7).

When defendant Warmack initially encountered plaintiff Frasure, two clicks are audible in his BWC footage. (Warmack BWC, 00:43:53-43:56). Defendant Warmack explained in his

affidavit and deposition that he had unholstered and placed the firearm at a low ready position, but he only ever pointed it at the decedent.  (Warmack Dep., Doc. 49-7 at PAGEID 1652, 67:4-20; Warmack Aff., Doc. 49-4 at PAGEID 1612, ¶¶ 22, 24).

As defendant Warmack repeated his commands to plaintiff Frasure, his BWC reflects the decedent in the driver's seat of the van to plaintiff Frasure's left.  (Warmack BWC, 00:43:57-43:58).  The decedent then started the ignition, which is audible.  (*Id.*).  Defendant Warmack raised his firearm and approached the decedent in the van by crossing a grassy hill between the driveway and paved area behind 320 Durrell and walking towards the front of the van.  (*Id.* at 00:43:58-44:01).  The van then moved backwards and away from defendant Warmack until it ran into some sort of obstruction.  (*Id.* at 00:44:01-44:07).  During this time, defendant Warmack loudly, forcefully, and repeatedly commanded the decedent to stop and get out of the car.  (*Id.*). Defendant Warmack made eye contact with the decedent (Warmack Aff., Doc. 49-4 at PAGEID 1613, ¶ 28), and then the decedent began to accelerate forward.  (Warmack BWC, 00:44:07). Defendant Warmack appears to be in front of the van as it began moving forward, as reflected by his shadow in the BWC screenshot below (*id.* at 00:44:07-09), but avoided contact by jumping out of the way and into a pile of debris.  (Warmack Aff., Doc. 49-4 at PAGEID 1613, ¶ 28; Warmack Dep., Doc 40-1 at PAGEID 520, 81:5-8 (explaining that he did not shoot because he knew he could jump out of the way)).



After this, an audible "honk" of the van's horn can be heard on his BWC. (*Id.* at 00:44:11). Defendant Warmack remembered it sounding as if the decedent then "floored it" toward the other Officers. (Warmack Aff., Doc. 49-4 at PAGEID 1613, ¶ 29). Defendant Warmack continued to repeat his commands to the decedent to stop and get out of the car as he passed. (Warmack BWC, 00:44:07-44:12).

2. *Defendant Jones' perspective*

When defendant Jones reached the confrontation between defendant Warmack and plaintiff Frasure and the decedent, and he positioned himself near the northeast corner of 320 Durrell. (Jones BWC, 00:43:58). Based on hearing defendant Warmack's multiple commands, he anticipated a non-compliant burglary suspect and unholstered and raised his firearm. (Jones Aff., Doc. 49-5 at PAGEID 1619, ¶¶ 17-18; Jones BWC, 00:43:56-53:59). Defendant Jones initially pointed his firearm at plaintiff Frasure, believing that defendant Warmack was focused on the decedent in the van. (Jones BWC, 00:43:56-44:06; Jones Aff., Doc. 49-5 at PAGEID 1620, ¶ 19).

As the decedent began reversing the vehicle, defendant Batts ran in front of defendant Jones, who stated, "we got a vehicle taking off, silver van, one at gunpoint." (Jones BWC, 00:44:02-44:05). Defendant Jones then moved behind the east side wall of 320 Durrell and his BWC lost sight of the confrontation for a moment. (*Id.* at 00:44:06-08). Just after he moved back around the rear corner of 320 Durrell and into sight of the confrontation, though it is not entirely clear from the lighting/perspective of defendant Jones' BWC footage, defendant Jones witnessed the van pointing and accelerating towards defendant Warmack. (Jones Aff., Doc. 49-5 at PAGEID 1620-21, ¶ 22). He yelled to defendant Warmack to back up. (Jones BWC, 00:44:09-44:10). The van was visibly accelerating forward towards defendant Batts, who began running toward the grassy hill up to the driveway between 320 and 322 Durrell. (*Id.* at 00:44:08-13). There was a honk of the van's horn after the van passed defendant Warmack. (*Id.* at 00:44:11). The following is a screenshot from approximately one second later (the blue arrow points to defendant Batts):



Defendant Jones thought defendant Warmack might have been sideswiped based on the

motion of defendant Warmack's flashlight.  (Jones Dep., Doc. 49-9 at PAGEID 1697, 41:16-22).

At this point, he "fear[ed] [for his] life and was certain [defendant] Batts was going to be struck.

. . ."  (*Id.* at PAGEID 1698, 42:6-7).  Defendant Jones fired one shot toward the van.  (Jones

BWC, 00:44:14; Leiloglou Decl., Doc. 49-15 at PAGEID 1874-75 & n.18).  He testified he fired

a shot to stop the van from hitting defendant Batts and he "jumped out of [the van's] path, down

into the driveway" behind 320 Durrell.  (Jones Dep., Doc. 49-9 at PAGEID 1698, 42:11-16).

The following screenshot reflects defendant Jones' proximity to the van as it headed towards the

driveway leading to Durrell Ave.



When interviewed about the incident on February 2, 2023, a few days later, defendant

Jones recalled initially thinking he was in a good position as the decedent began to accelerate

forward but then realizing that the decedent was crossing the embankment, turning up on to the

driveway between 320 and 322 Durrell, and "coming right at [he and defendant Batts]."  (Doc. 9-

1, Ex. K, Jones Interview, 15:35:02-35:34).  Defendant Jones then stated that he had "lost track"

of exactly where defendant Batts had gone but knew defendant Batts was "definitely in front of

the van" to his right side—likely to be struck. (*Id.* at 15:35:40-36:08).

### 3. *Defendant Batts' perspective*

Defendant Batts was initially situated near defendant Jones upon reaching the rear of 320 Durrell, which is where he appeared to draw and point his firearm toward plaintiff Frasure and the van. (Batts BWC, 00:43:58-44:00).[6] As the van began to move backwards with defendant Warmack approaching it, defendant Batts descended the grassy hill between the driveway and paved area behind 320 Durrell. (*Id.* at 00:44:01-44:07). When the van stopped, defendant Batts was positioned behind defendant Warmack. (*Id.*). Defendant Batts states that, during this repositioning, he did not display or point his firearm at anyone. (Batts Aff., Doc. 49-6 at PAGEID 1630, ¶ 22).

The van then began accelerating forward and there is an audible screeching of tires. (Batts BWC, 00:44:06-44:13). Defendant Batts repeatedly tells defendant Warmack to "back up." (*Id.*). The following is a screenshot during this time from defendant Batts' perspective, which shows defendant Warmack moving out of the way of the van.

---

[6] In his deposition, defendant Batts explains that the "initial instance of [him] drawing [his] weapon" was at the decedent but he also, "[a]t one point[,]" pointed his gun at plaintiff Frasure when he disobeyed commands and put his hands by his waistband. (Batts Dep., Doc. 49-8 at PAGEID 1675, 69:1-25).



Batts then turned, lowered his firearm, and ran back up the grassy hill that he had previously descended and onto the driveway on the east side of 320 Durrell. (*Id.* at 00:44:10-44:13; Batts Aff., Doc. 49-6 at PAGEID 1630, ¶ 24). Defendant Batts then turned to see where the van was, perceived it to be only feet away coming towards him, and believed he would be struck and pinned to the side of 322 Durrell or at least sideswiped by the van as it drove up the grassy hill and turned onto the driveway between 320 and 322 Durrell. (Batts Aff., Doc. 49-6 at PAGEID 1630-31, ¶¶ 26-27).

After he ran back up the hill and onto the driveway between 320 and 322 Durrell, defendant Batt's BWC footage shows that he is closer to 322 Durrell and defendant Jones is across the driveway, near the northeast corner of 320 Durrell. (Batts BWC, 00:44:12-44:13). Gunshots are audible on the recording (*id.* at 00:44:13-44:15) as the van passes defendant Jones and appears to head in the direction of defendant Batts, demonstrated in the screenshot below (defendant Jones is in the blue box):



Within the same second, a screenshot shows that the wheels of the van had turned away from defendant Batts as his firearm is drawn and pointed at the van.



Defendant Batts testified that he discharged his firearm because he felt he "had to" to avoid being "run over. . . ." (Batts Dep., Doc. 49-8 at PAGEID 1673, 57:2-3; Batts Aff., Doc. 49-6 at PAGEID 1631, ¶ 28).

       4.     *Aftermath*

14

After defendants Jones and Batts fired shots, the van turned and crashed into 320 Durrell. (*See* Warmack BWC, 00:44:13-44:21).  Defendant Warmack moved towards the driver's side of the van and pointed his firearm towards the decedent.  (*Id.*).  Defendant Batts returned to the rear of 320 Durrell, where he eventually spotted plaintiff Frasure with his flashlight and repeatedly ordered him to the ground, initially without success, as plaintiff Frasure approached the other vehicle in the paved area behind 320 Durrell.  (Batts BWC, 00:44:21-45:07).  Defendant Batts was unsure whether that other vehicle contained weapons, or would be used as a weapon, as plaintiff Frasure was not complying with commands.  (Batts Aff., Doc. 49-6 at PAGEID 1632, ¶ 32).

At around the same time, defendant Jones ordered plaintiff Frasure "on the ground" as plaintiff Frasure leaned on the hood of the vehicle still located in the paved area behind 320 Durrell.  (Jones BWC, 00:44:57-44:59).  Before plaintiff Frasure complied, defendant Jones stated, "you're gonna get shot!  On the ground!"  (*Id.* at 00:45:00-03).  Plaintiff Frasure replied, "why you gonna shoot me for?" but eventually kneeled in front of the vehicle.  (*Id.* at 00:45:03-45:15).

Immediately after the van hit the side of 320 Durrell, its wheels can be seen and heard spinning with smoke emanating from the van.  The Officers repeatedly order the decedent out of the van.  They then discovered the decedent unresponsive and extracted him from the van. (Jones, Batts, and Warmack BWC, 00:44:18-46:33).  By this time, backup had arrived, and the Officers began lifesaving measures.  (*See id.*; Warmack Aff., Doc. 49-4 at PAGEID 1614, ¶ 30; Jones Aff., Doc. 49-5 at PAGEID 1622, ¶ 29 ; Batts Aff., Doc. 49-6 at PAGEID 1632, ¶ 33).

The decedent was pronounced dead on January 31, 2023.  (Hamilton County Coroner's

15

records, Doc. 48-5 at PAGEID 1513-15). The Hamilton County Coroner stated the cause of

death as "gunshot wound of head." (*Id.* at PAGEID 1515). The post-mortem exam report

indicates the bullet entered 2 ¼ inches behind the left inner ear and traveled "left to right, back to

front, and slightly do[w]nward." (*Id.* at PAGEID 1517; *see also id.* at PAGEID 1514).

The City turned the investigation of the incident over to the Hamilton County Sheriff's

Office Criminal Investigation Section (CIS) for an independent, forensic investigation. (Brady

Aff.,[7] Doc. 49-17 at PAGEID 1897, ¶ 39). Detective Kevin Illing led the investigation, which

included, *inter alia*, his videorecorded interview with plaintiff Frasure a few hours after the

incident.[8] (Illing Aff., Doc. 49-21 at PAGEID 1970, ¶ 4 and PAGEID 1972-73, ¶ 12). In the

recording, plaintiff Frasure told Detective Illing that the decedent had "shot down the steps"

when one of the Officers had looked through the front door of 320 Durrell. (Illing Aff., Ex. 4

(recorded interview with plaintiff Frasure), 04:06:24-30[9]). Plaintiff Frasure explained that the

decedent was wanted for absconding and, therefore, was running and asked plaintiff Frasure to

run too, but he declined. (*Id.* at 04:07:29-07:45). Plaintiff Frasure also expressed to Detective

Illing that the decedent "almost" hit defendant Warmack with the van after backing into the

bushes. (*Id.* at 04:06:47-57). Although he initially stated that the other two officers were not in

danger (*id.* at 04:06:57-07:01), later, when describing the officer (defendant Batts) running up

the grassy hill away from the van as it accelerated forward, plaintiff Frasure stated: "I get it . . . ,

[7] Brooke Brady is (and was at the time of the events at issue) the City's Chief of Police. (Doc. 49-17 at PAGEID 1888, ¶ 3).
[8] In his deposition, plaintiff Frasure stated that he did not remember this interview (Frasure Dep., Doc. 44-1 at PAGEID 977); but he also stated that, during that this interview, he was "scared to death they weren't going to let [him] go home. [He] was going to tell them anything they wanted to hear so [he] could get to [the decedent]." (*Id.* at PAGEID 978, 102:19-22).
[9] Like the BWC footage submitted, this video includes an information stamp with the location, date, and time at the bottom of the image.

if I was the cop I'd probably do the same thing." (*Id.* at 04:12:27-13:02). Detective Illing asked, "Do you think . . . your son almost ran him over? Was he that close to him?" and plaintiff Frasure responded, "may have been." (*Id.* at 4:13:01-13:12).

When CIS completed the investigation, they turned it over to the Hamilton County Prosecutor, who determined the shooting resulted from the Officers' self-defense and did not charge any of the Officers with a crime. (Illing Aff., Doc. 49-21 at PAGEID 1971-72, ¶ 9; Hamilton County Prosecuting Attorney Press Release, Doc. 49-16). City Chief of Police Brooke Brady convened a Use of Force Review Board, consisting of senior police officers both in and outside the City, and the Review Board conducted a further independent investigation of the incident following the CIS and Hamilton County Prosecutor's determinations. (Brady Aff., Doc. 49-17 at PAGEID 1897-98, ¶¶ 40-42). The Review Board found that the Officers acted appropriately, and Chief of Police Brady reviewed and approved the findings. (*Id.* at PAGEID 1898-99, ¶¶ 43-45).

5.     *Plaintiffs' claims*

Based on the foregoing, the first claim in the amended complaint alleges an excessive use of force claim against each of the Officers for pointing their weapons at the decedent and plaintiff Frasure during the initial phase of the encounter. (Pls.' Mot. Summ. J., Doc. 48 at PAGEID 1502). The second claim alleges that defendant Jones used excessive force when he pointed his firearm at and threatened plaintiff Frasure after the shooting.[10] The third claim alleges that defendants Jones and Batts used excessive force against the decedent when they fired

---

[10] The second claim in the amended complaint retains a reference to defendant Batts, but the Court believes this to be a scrivener's error based on plaintiff's motion for leave to amend. (*See* Doc. 57).

their weapons. The fourth claim alleges that the City ratified the Officers' unconstitutional actions. The fifth claim alleges the City failed to train the Officers.[11] The sixth claim alleges the City adopted several unconstitutional customs, practices, and policies. The seventh claim alleges a wrongful death claim under Ohio law against the City, defendant Batts, and defendant Jones. The eighth claim alleges negligence against all defendants.

6.    *Expert reports*

Defendants submitted the declaration and report of Angelos G. Leiloglou, who performed a reconstruction of the uses of force using photogrammetric and spectrographic audio analyses. (*See* Leiloglou Decl., Doc. 49-15 at PAGEID 1849, ¶ 2). He summarized his opinions as follows:

a. As [the decedent] turned his wheels and drove the minivan toward Officer Warmack, the van accelerated approximately 1.5 feet per second as Officer Warmack moved out of the way. Officer Warmack was approximately 4.5 feet to 7.5 feet from the front bumper of the van.

b. As [the decedent] was driving the van up over a grassy berm in the direction of Officers Jones and Batts, the van was traveling at approximately 12.5 feet per second. Officer Jones was 15.6 feet away, and Officer Batts was 16.9 feet away.

c. There were multiple shots fired, with all shots occurring in less than one second. As stated on pages 4 and 5 of my Report, the four shots were a "split-second" apart from one another. The waveform and spectrograms on pages 10 and 11 of my Report demonstrate that all shots occurred within a period of 0.752 to 0.754

---

[11] The amended complaint asserts claims four and five against all defendants. Defendants argue that plaintiffs' fourth and fifth claims, as asserted against the Officers personally or in their individual capacities, must fail because municipal liability claims cannot be brough against individuals, and they are otherwise duplicative of the claims against the City. *See Ostipow v. Federspiel*, No. 16-cv-13062, 2018 WL 3428689, at *10 (E.D. Mich. July 16, 2018) (municipal liability claims are "brought against a municipality, not against an individual."), *aff'd*, 824 F. App'x 336 (6th Cir. 2020); *Simmons v. City of Columbus*, No. 2:24-cv-1550, 2025 WL 510059, at *7 (S.D. Ohio Feb. 14, 2025) (citing *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003)) ("When a government entity is also named as a defendant, along with the government official in his or her official capacity, federal courts will dismiss the official capacity claim."). Plaintiffs did not respond to this argument and therefore appear to concede it. This Order therefore addresses claims four and five as asserted only against the City.

seconds– *i.e.*, in less than one second.

d. At the time of the first shot, Officer Jones was approximately 8.5 feet away from the front fender of the van, and the van was traveling at approximately 9.5 feet per second.

e. Approximately 0.2 seconds before the second shot, Officer Batts was approximately 14.3 feet away from the van, and the van was traveling at approximately 9.4 feet per second. I was unable to photogrammetrically determine the distance the van was from Officer Batts when shots were fired, but based upon the evidence, and considering Officer Batts's movements and that of the van, he was estimated to be between 9 to 14 feet away.

(*Id.* at PAGEID 1850-51, ¶ 7). According to Mr. Leiloglou, defendant Jones fired one shot first, and defendant Batts fired three shots after. (*Id.* at PAGEID 1874).

Defendants also submitted the expert report of Dr. Ron Martinelli—a forensic criminologist, certified medical investigator, and law enforcement practices expert. (Martinelli Aff., Doc. 49-10 at PAGEID 1713, ¶ 12). Dr. Martinelli opined on:

- Whether the Officers acted in accordance with "their law enforcement education, training, department policies and recognized, accepted, and applied and trained codified law enforcement practices and standards of care" during the initial response to the dispatch and contact with the decedent and plaintiff Frasure.

- Whether the decedent's actions "posed an imminent threat of force against [the Officers] that could result in serious bodily injury or death."

- "Whether the Officers made reasonable attempts to de-escalate [the decedent]" before using deadly force.

- "Whether placing [plaintiff Frasure] at gunpoint constituted an application of excessive force."

- "Whether the City . . . (a) failed to properly train the Officers, (b) was negligent or deliberately indifferent toward [plaintiff Frasure or the decedent], (c) the City had informal or formal customs or practices, or (d) ratified any alleged constitutional violations."

19

(*Id.* at PAGEID 1713-14, ¶ 14).

Dr. Martinelli concluded that the Officers' actions were consistent with their law enforcement education, training, department policies and recognized, accepted, and applied and trained codified law enforcement practices and standards of care; the decedent's actions posed an imminent threat of force against the Officers that could result in serious bodily injury or death; the Officers made reasonable attempts to de-escalate the decedent prior to using deadly force; placing plaintiff Frasure at gunpoint was not excessive force; and there was no evidence of any failures, negligence or indifference, informal or formal customs or practices, or ratification on the part of the City. (*Id.*).

Dr. Martinelli used Mr. Leiloglou's conclusions to determine the amount of time defendant Jones and defendant Batts had to react when they fired shots at the van. (*See id.* at PAGEID 1787 n.196). Dr. Martinelli explained that it takes an average police officer approximately 1.96 to 2.74 seconds to experience a threat; decide how to respond; and raise, point, and shoot an unholstered firearm. (*Id.* at PAGEID 1786). He then calculated that defendant Jones had 0.89 seconds to react when he fired his shot, and defendant Batts had approximately 1.5 seconds to react when he fired his first of three shots. (*Id.* at PAGEID 1788). Dr. Martinelli further concluded that "it would be unreasonable to expect that [defendants Jones and Batts] would have time to jump out of the way of the moving minivan." (*Id.* at PAGEID 1790).

Defendant's third expert, Gregory Gilbertson—an expert in policing and related training and education—offered opinions consistent with Dr. Martinelli's conclusions with respect to the Officers' actions and the threat posed by the decedent. (Gilbertson Decl., Doc. 49-18 at

20

PAGEID 1902-03, ¶¶ 7-9).

Plaintiff filed the expert report of Dr. Lawrence Hunter to opine on the use of force issues in this case. The Court granted defendants' *Daubert* motion and motion in limine to exclude Dr. Hunter's report and testimony in this case for the reasons set forth in the Court's September 17, 2025 Order. (*See* Doc. 89).

## II. Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A grant of summary judgment is proper unless the nonmoving party "establish[es] genuinely disputed material facts by 'citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence . . . of a genuine dispute.'" *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 403 (6th Cir. 2019) (quoting Fed. R. Civ. P. 56(c)(1)). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249. The trial court need not search the entire record for material issues of fact, *Street v. J.C.*

21

*Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, "[f]acts that are not blatantly contradicted by [the evidence] remain entitled to an interpretation most favorable to the non-moving party." *Coble v. City of White House, Tenn*., 634 F.3d 865, 870 (6th Cir. 2011). "In response to a properly supported summary judgment motion, the non-moving party 'is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Maston v. Montgomery Cnty. Jail Med. Staff Pers*., 832 F. Supp. 2d 846, 849 (S.D. Ohio 2011) (quoting *Sixty Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).

A fact is "material" if its resolution will affect the outcome of the lawsuit. *Beans v. City of Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *5 (N.D. Ohio Dec. 30, 2016), *aff'd*, No. 17-3088, 2017 WL 3726755 (6th Cir. 2017) (citing *Anderson*, 477 U.S. at 248). The party who seeks summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. To make its determination, the court "need consider only the cited materials, but it may consider other

materials in the record." Fed. R. Civ. P. 56(c)(3). The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968).

## III.    Analysis

To establish their § 1983 claims, plaintiffs must show "that a person acting under color of state law deprived [them] of a right secured by the Constitution or laws of the United States." *Clark v. Abdallah*, 131 F.4th 432, 444 (6th Cir. 2025) (quoting *Adams v. Blount Cnty.*, 946 F.3d 940, 947 (6th Cir. 2020)) (alteration in original). At issue here is the Fourth Amendment, which protects "against unreasonable searches and seizures." U.S. Const. amend. IV. This includes an excessive use of force. *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019). Whether force is excessive is judged using an "objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Id.* (quoting *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007)). Courts are to consider "the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (quoting *Muehler v. Mena*, 544 U.S. 93, 108 (2005)).

The reasonableness inquiry considers the totality of the circumstances, including but not limited to "1) the severity of the crime at issue; 2) whether the suspect posed an immediate threat to the safety of the police officers or others; and 3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Id.* (quoting *Harris v. City of Circleville*, 583 F.3d 356, 365 (6th Cir. 2009)). *See also Graham v. Connor*, 490 U.S. 386, 396 (1989) (originating the three-

23

factor analysis). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

The Officers have asserted qualified immunity as to plaintiff's first, second, and third claims, which "shields [them] from damages suits unless their conduct 'violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Clark*, 131 F.4th at 444 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When asserted at the summary judgment stage, "the burden shifts to the plaintiffs to demonstrate that (1) the facts, taken in the light most favorable to the plaintiffs, show that the officer violated their constitutional right, and (2) the right was so clearly established at the time of the officer's conduct that the officer would have understood that he was violating the plaintiffs' rights." *Id.* The Court may address these prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A. <u>The Officers' initial pointing of firearms</u>[12]

1. *Reasonableness*

The Sixth Circuit has held that "pointing a firearm at an individual and making a demand of that individual . . . communicates the implicit threat that if the individual does not comply

---

[12] Defendants argue that plaintiffs should not be permitted to raise this claim because they failed to clarify the specific actions undertaken by each officer during discovery. (*See* Doc. 61 at PAGEID 2675, 2686). The Court agrees that the claim is not a model of clarity, but between plaintiff Frasure's deposition testimony, plaintiffs' motion for summary judgment, and plaintiffs' response to defendants' motion for summary judgment, the Court understands the claim to be asserted against each of the Officers during the period when the Officers initially encountered plaintiff Frasure and the decedent until the decedent began driving the van. (*See* Frasure Dep., Doc. 44-1 at PAGEID 1015-17; Doc. 48 at PAGEID 1502-03; and Doc. 58 at PAGEID 2034-39).

with the [ ] demands, the [one pointing the firearm] will shoot the individual." *United States v. Bolden*, 479 F.3d 455, 461 (6th Cir. 2007). Depending on the circumstances surrounding the pointing of a firearm, it may constitute an unreasonable seizure. *See Vanderhoef*, 938 F.3d at 279-81 (summarizing authority and holding that the "defendant should have known that pointing his gun at plaintiff—a nonfleeing teenager whom he did not reasonably suspect of any prior crime beyond speeding and reckless driving—and holding him at gunpoint for roughly two minutes, violated plaintiff's Fourth Amendment rights."); *Binay v. Bettendorf*, 601 F.3d 640, 644, 650 (6th Cir. 2010) (holding there was a genuine issue of material fact as to whether there was a Fourth Amendment violation when masked officers forced two entirely compliant individuals to the ground and held them at gunpoint for approximately an hour during the execution of a search warrant). The Court examines the three *Graham* factors in assessing the reasonableness of the Officers' actions. *Vanderhoef*, 938 F.3d at 276.

a. Defendant Warmack

Defendant Warmack testified that he pointed his firearm at the decedent. (Warmack Dep., Doc. 49-7 at PAGEID 1652, 67:4-20). BWC footage from all of the Officers suggests that this occurred for approximately six seconds. (*See* BWC, 00:43:59-44:05). Defendant Warmack states unequivocally in his affidavit and deposition that he did not point his weapon at plaintiff Frasure. (*See* Warmack Dep., Doc. 49-7 at PAGEID 1652, 67:4-20; Warmack Aff., Doc. 49-4 at PAGEID 1612, ¶¶ 22, 24). Plaintiff Frasure testified that when he came out of the building and put his hands up, "they had their guns out right away" and "already had them at us." (Frasure Dep., Doc. 44-1 at PAGEID 1016, 140:2-4). When asked to identify when the officers pointed their weapon at the decedent, he testified, "[t]he whole time he's in the van, *they* had weapons

25

*drawn* on *us*." (Frasure Dep., Doc. 44-1 at PAGEID 1017, 141:5-10) (emphasis added)). Defendant Warmack's BWC footage shows that when defendant Warmack reached the back of the building, he encountered plaintiff Frasure and shouted "hey, stop" and commanded plaintiff Frasure place his hands in the air. (Warmack BWC, 00:43:53-43:59). Plaintiff Frasure raised only one hand until Warmack repeated his command to Frasure to "put your hands in the air." (*Id*.). (*Id*.; Warmack Aff., Doc. 49-4 at PAGEID 1611, ¶ 16 ("I used my flashlight to illuminate [plaintiff Frasure] so that I could observe him, and I gave [plaintiff Frasure] clear commands to stop.")). Plaintiff Frasure then stated "I ain't going nowhere." (Warmack BWC, 00:43:54-43:58). It is not clear from any of the Officers' BWC footage the position of defendant Warmack's firearm when he first encountered plaintiff Frasure.

Viewing the evidence in the light most favorable to plaintiffs, *Stoudemire v. Mich. Dept. of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013) ("In evaluating if a defendant is entitled to qualified immunity, the Court must adopt the plaintiff's version of the facts . . . unless the plaintiff's version is blatantly contradicted by the record, so that no reasonable jury could believe it."), the Court finds an issue of fact on whether defendant Warmack pointed his firearm at plaintiff Frasure during their initial encounter. None of the BWC footage settles the matter. *See Raimey v. City of Niles, Ohio*, 77 F.4th 441, 447 (6th Cir. 2023) (finding a court must "'view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff.'") (quoting *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022)). The Court favorably construes plaintiff Frasure's testimony about the initial encounter (*see* Frasure Dep., Doc. 44-1 at PAGEID 1016-17) to raise a genuine issue of material fact as to whether defendant Warmack pointed his gun at plaintiff Frasure during that time.

26

Thus, the question is whether defendant Warmack's actions were objectively reasonable when he pointed his firearm at plaintiff Frasure (Warmack BWC, 00:43:53-43:59) and at the decedent (*id.* at 00:43:59-44:05) for approximately six seconds each.  At this time, defendant Warmack knew he was outnumbered until his fellow Officers joined him behind 320 Durrell. (Warmack Aff., Doc. 49-4 at PAGEID 1612, ¶ 20).  He observed that plaintiff Frasure was not fully compliant, and the decedent was totally noncompliant and potentially dangerous—as he was behind the wheel of the van.  (*Id.*, ¶ 21).  Neither plaintiff Frasure nor the decedent had been searched for weapons, and defendant Warmack had seen plaintiff Frasure raise one hand with his other remaining at his waistband until repeating the command to place hands in the air.  (*Id.* at PAGEID 1611-12, ¶¶ 17-19; Warmack BWC, 00:43:54-43:56).

Turning to the first *Graham* factor, plaintiff Frasure and the decedent were suspected of burglary—a serious crime.  *See Crawford v. Geiger*, 656 F. App'x 190, 207 (6th Cir. 2016) ("[B]urglary and breaking and entering are both felonies under Ohio law, see Ohio Rev. Code §§ 2911.12, 2911.13, and therefore crimes of notable severity. . . ."); *Phillips v. Blair*, 786 F. App'x 519, 530 (6th Cir. 2019) (holding that "burglary constitutes a serious crime" for purposes of the first *Graham* factor).

The second factor, whether there was an imminent threat, also favors defendant Warmack.  Defendant Warmack encountered plaintiff Frasure alone, at the back of the building, in the middle of the night.  Defendant Warmack was attired in full police uniform and gave repeated commands to plaintiff Frasure to raise his hands.  Plaintiff Frasure raised one hand while keeping his other hand near his waist, where officers are trained that suspects conceal weapons.  (*See* Martinelli Decl., Doc. 49-10 at PAGEID 1776).  *See Lemmon v. City of Akron,*

27

*Ohio*, 768 F. App'x 410, 415 (6th Cir. 2019) (placing a hand in a waistband "would lead a reasonable person to believe danger existed"). Only after repeated commands did plaintiff Frasure raise his other hand. Defendant Warmack had not searched plaintiff Frasure for weapons.

The first and second *Graham* factors also favor defendant Warmack as to his pointing a firearm at the decedent. The BWC footage readily demonstrates that the decedent was actively disregarding repeated orders to stop and get out of the van. *See Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) ("[A] car can be a deadly weapon."). In addition, defendant Warmack was attired in his police uniform, and the decedent had not been searched for weapons that may have been in the van. Defendant Warmack faced an imminent threat of harm under the circumstances.

The third factor—whether plaintiff Frasure and the decedent attempted to evade or resist arrest—is mixed. Plaintiffs concede that the decedent was attempting to flee; therefore, this factor favors defendant Warmack with respect to the decedent. While there is no evidence that plaintiff Frasure was attempting to flee or evade arrest for the six seconds defendant Warmack pointed his firearm at plaintiff Frasure, the *Graham* factors "are not the end of the matter, as the court ultimately must determine whether the totality of the circumstances justifies a particular sort of seizure." *Martin v. City of Broadview Heights,* 712 F.3d 951, 958 (6th Cir. 2013) (internal quotation and citation omitted). Allowing for the fact that defendant Warmack was faced with circumstances that were "tense, uncertain, and rapidly evolving," *Graham*, 490 U.S. at 396-97, the Court finds that the totality of the circumstances in this case demonstrate that defendant Warmack's momentary pointing of his firearm at both Frasure and the decedent was reasonable as a matter of law. *See Crisp v. City of Kenton*, 142 F.3d 432, *5 (6th Cir. 1998)

(holding that pointing a firearm at a suspect for approximately 24 minutes while the police secured the suspects, cleared the perimeter, and checked the suspects' identities was not excessive force as a matter of law) ("We think that it should be obvious . . . that police officers arriving in the dark, at the scene of a reported crime in progress, cannot afford to take chances with their safety.").  Therefore, the Court finds no Fourth Amendment violation based on defendant Warmack's pointing his firearm at plaintiff Frasure or the decedent.

b. <u>Defendant Jones</u>

As to defendant Jones, viewing his BWC footage in plaintiffs' favor, a jury could reasonably infer that he pointed his firearm at plaintiff Frasure from approximately 12:43:58 a.m. to 12:44:05 a.m.—around 10 seconds.  (*See* Jones BWC 00:43:58-00:44:08).  Prior to that, he had not yet reached the rear of 320 Durrell, and after that, he had started to run away from plaintiff Frasure and the decedent.  (*See id.*).  By the time defendant Jones came back around the side of 320 Durrell and appears to point his weapon at the van, the van began to move forward towards defendants Warmack and Batts.  (*See id.* at 00:44:08-44:10).

In his affidavit, defendant Jones stated that, prior to his encounter with the suspects, he had heard defendant Warmack call to his fellow officers in a "strained" voice and based on defendant Warmack's repeated commands, he anticipated a non-compliant burglary suspect. (Jones Aff., Doc. 49-5 at PAGEID 1619, ¶¶ 16-18).  Jones had also witnessed what appeared to be someone fleeing down the steps through the locked front door prior to coming around the back of 320 Durrell. (Jones Dep., Doc. 49-9 at PAGEID 1697, 41:2-5).  Once he arrived on scene, defendant Jones "was concerned for everyone's safety" because he saw "multiple burglary suspects who were not yet searched for weapons, fleeing a residence at night, all while one

29

suspect was inside of a vehicle that could take off and place everyone's lives (including the life of [plaintiff Frasure]) in danger." (Jones Aff., Doc. 49-5 at PAGEID 1619-20, ¶ 19). After momentarily retreating around the side of 320 Durrell, defendant Jones witnessed plaintiff Frasure move (despite commands otherwise) and the decedent accelerating forward towards (and possibly hitting) defendant Warmack. (*Id.*, ¶ 22).

The three *Graham* factors also weigh in defendant Jones' favor. As explained above, the suspected crime (burglary) was serious. It was the middle of the night, plaintiff Frasure had not been checked for weapons, and plaintiff Frasure disobeyed commands to stop. (*See* Jones BWC, 00:44:00-44:06 (plaintiff continues to move after being ordered to stop)). When he pointed his firearm at plaintiff Frasure, defendant Jones perceived a potential threat based on defendant Warmack's strained voice and repeated commands. *Lyons v. City of Xenia*, 417 F.3d 565, 577 (6th Cir. 2005) (considering "a tone of distress in the voice" of a fellow officer as evidence of a threat to that officer).

When defendant Jones pointed his firearm at the decedent as the decedent began accelerating forward in the van towards his fellow Officer, the safety threat was obvious. *See United States v. Hensley*, 469 U.S. 221, 235 (1985) (officers "were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo"). As discussed with defendant Warmack, the third *Graham* factor is mixed. But at a minimum, defendant Jones observed plaintiff Frasure not comply with commands to stop and the decedent attempt to flee. The totality of the circumstances support the conclusion defendant Jones' momentary pointing of his firearm at this juncture was reasonable. *See Crisp*, 142 F.3d 432, at *5. The Court finds that defendant Jones acted reasonably under the circumstances and did not

30

violate the Fourth Amendment rights of plaintiff Frasure or the decedent by pointing his firearm at them.

c.   <u>Defendant Batts</u>

As to defendant Batts, a jury could reasonably infer that he pointed his firearm at plaintiff Frasure from approximately 12:44:00 a.m. to 12:44:01 a.m., when he first confronted plaintiff Frasure and the decedent. Defendant Batts then repositioned himself by descending into the paved area behind 320 Durrell as the van backed into an obstruction. (*See* Batts BWC, 00:44:01-44:08; Batts Aff., Doc. 49-6 at PAGEID 1630, ¶ 22 (explaining that he did not point his firearm at anyone as he repositioned)). Defendant Batts' BWC then shows him raise his firearm towards the decedent for a moment or two just before the decedent begins to accelerate forward towards defendant Warmack despite defendant Warmack's commands otherwise; then defendant Batts turns and runs away from the van. (Batts BWC, 00:44:08-44:10; Jones BWC, 00:44:11-44:12 (showing defendant Batts' back toward the van)).

Prior to this, defendant Batts had witnessed someone inside 320 Durrell notice police presence and try to hide. (Batts Aff., Doc. 49-6 at PAGEID 1628, ¶ 14). Defendant Batts also heard defendant Warmack call "back" to his fellow officers in a way that "conveyed . . . a sense of urgency," and based on hearing defendant Warmack's repeated commands, he anticipated a confrontation with a noncompliant burglary suspect. (*Id.* at ¶ 16). When he initially confronted plaintiff Frasure outside and the decedent inside the van, he observed multiple non-compliant burglary suspects at night, and "drew his firearm for officer safety purposes." (*Id.* at PAGEID 1629, ¶ 18).

Like with the other Officers, the *Graham* factors weigh in defendant Batts' favor.

31

Defendant Batts was responding to a call regarding a serious crime in the middle of the night. His observations, summarized above, demonstrated an imminent threat to his safety. *See Lyons*, 417 F.3d at 577 (considering "a tone of distress in the voice" of a fellow officer as evidence of a threat to that officer); *Hensley*, 469 U.S. at 235 (a vehicle can be a deadly weapon). Defendant Batts observed plaintiff Frasure walking after being ordered to stop (Batts BWC, 00:43:49-44:02), and the decedent was attempting to flee. Considering the totality of the circumstances, these momentary instances of defendant Batts pointing his firearm were reasonable and did not violate the Fourth Amendment. *See Crisp*, 142 F.3d 432, at *5.

The Court's conclusion with respect to the reasonableness of each of the Officers' actions at this phase of the encounter is further supported by unrefuted expert testimony. Dr. Martinelli opined that the Officers' actions during the initial encounter "were consistent with their law enforcement education, training, department policies and recognized, accepted, and applied and trained codified law enforcement practices and standards of care." (Martinelli Decl., Doc. 49-10 at PAGEID 1713). (*See id.* at PAGEID 1757-60 (summarizing the Officers' observations during their initial response and concluding that "[a]ll of the aforementioned circumstances and facts would have caused a reasonably trained officer to believe that possible criminal activity was afoot and there was a relationship between anyone found exiting and/or outside of the property and that activity.")). In particular, Dr. Martinelli opined that "[o]fficers are trained that burglary in-progress and suspicious circumstances are extremely dangerous circumstances where officers encounter unknown subjects who may be armed." (*Id.* at PAGEID 1760).

Likewise, Mr. Gilbertson opined that it was "consistent with national standards of policing, police practice, and national training trends" for the Officers to find that plaintiff

32

Frasure and the decedent exhibited an imminent threat. (Gilbertson Decl., Doc. 49-18 at PAGEID 1903). (*See also id.* at PAGEID 1918 ("National practices and training protocols" would have cautioned the officers to expect violence under the circumstances the Officers were in.). He also opined that the Officers' actions during the initial encounter with plaintiff Frasure and the decedent were consistent with these national standard and training trends, and the Officers exhibited "remarkable restraint." (*See id.* at PAGEID 1903).

The Court also considered plaintiffs' argument that it was objectively unreasonable for the Officers to believe that a burglary was in progress upon arriving at the scene and initially encountering plaintiff Frasure and the decedent. Plaintiffs rely on the facts that the dispatch noted that 320 Durrell was vacant,[13] lights were on in various areas of 320 Durrell, the voices of adults and a child are audible through an open window on BWC footage, and there were cars in the driveway. (*See* Doc. 58 at PAGEID 2035). Plaintiffs emphasize that the Officers never announced themselves, though there was an opportunity to do so, and plaintiff Frasure and the decedent were unarmed and did not commit a crime. (*See id.* at PAGEID 2038).

None of those facts, however, undermine the Officers' reliance on the dispatch of a burglary in process and other observations at the scene. Without "independent knowledge" of the actual communication to police by Mr. Guest (i.e., a communication to a non-emergency line that did not reference burglary), the Officers "had no reason to doubt . . . the partially reliable

---

[13] Plaintiffs do not develop an argument on the significance of 320 Durrell being described as vacant. Nevertheless, the Court notes that burglary under Ohio law turns on whether an "occupied structure" is involved. *See* Ohio Rev. Code § 2911.12(A). The Ohio Supreme Court has held that that term is used in a "far broader" sense in burglary statutes "than in ordinary usage" and might include a structure that has only recently been vacated. *State v. Whitaker*, 207 N.E.3d 677, 697 (Ohio 2022) (quoting *State v. Johnson*, 935 N.E.2d 895, 898 (Ohio Ct. App. 2010) and citing *State v. Green*, 480 N.E.2d 1128, 1132 (Ohio Ct. App. 1984)).

information" from the dispatch. *Brown v. City of Wyoming*, No. 23-1285, 2024 WL 5040781, at

*5 (6th Cir. Dec. 9, 2024). *See also Blair*, 786 F. App'x at 530 (reversing denial of qualified

immunity, despite the plaintiff's argument that the officers had time to assess the scene prior to

detention, because evidence showed that the officers "reacted to a swiftly developing situation

and could not have ruled out . . . involvement in the reported burglary."). *See Graham*, 490 U.S.

at 396-97. While the Officers initially saw lights on and heard voices in the building, as well

cars parked behind the building, plaintiffs fail to explain why these facts should have

categorically excluded the continued investigation of a burglary to a reasonable officer on the

scene notwithstanding the dispatch otherwise[14]—particularly as there is no dispute that someone

rushed down the stairs to the rear of the building while passing the front door, which was locked,

even though it had been open on every other occasion the Officers' visited the building.[15]

    In addition, while the Officers did not announce themselves, they are clearly identifiable

as law enforcement officers when BWC footage shows someone in the building look out at them

and quickly turn away. (Batts BWC, 00:43:22-43:23). Finally, the Officers did not have an

opportunity to check plaintiff Frasure and the decedent for weapons.

    Plaintiff's framing invites the Court to view the scene with 20/20 hindsight. The Court is

required, however, view the facts and circumstances from the perspective of a reasonable officer

investigating a dispatch of a nighttime burglary in progress, where the suspects were partially

(plaintiff Frasure) or completely (the decedent) uncompliant with commands, and where it was

---

[14] To the extent plaintiffs may imply that the Officers knew that Ms. Coleman's family members would be cleaning out her apartment, the Court finds no genuine issue of fact to support this argument. *See supra* p. 2 n.4.

[15] (*See* Illing Aff., Ex. 4 (recorded interview with plaintiff Frasure), 04:06:24-30; and Jones Dep. Doc. 49-9 at PAGEID 1697, 41:2-5 (both describing an individual running down 320 Durrell's main stairwell)).

unknown whether the suspects were armed and dangerous in rapidly evolving circumstances lasting no more than 30 seconds. (*See* BWC, 00:43:49-44:15 (the period covering defendant Warmack saying "back" to shots fired)). The Officers acted reasonably during their initial encounter with plaintiff Frasure and the decedent, and plaintiffs have failed to create a genuine issue of fact on their Fourth Amendment claim.

2.     *Clearly established*

In addition, the Court concludes that plaintiffs have failed to carry their burden on the second prong of the qualified immunity analysis. This "demanding test" requires plaintiffs to:

> show that "every reasonable" officer would have realized that [the Officers'] conduct violated the Fourth Amendment under [the Sixth Circuit's] then-existing precedent. [*Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)] (citation omitted). In the fact-dependent excessive-force context, moreover, this test generally requires a plaintiff to identify a highly specific right or a case with analogous facts.

*Chaney-Snell v. Young*, 98 F.4th 699, 720 (6th Cir. 2024). It is not enough to rely on general propositions of Fourth Amendment law. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz,* 533 U.S 194, 201 (2001)) ("It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'").

It is plaintiffs' burden to demonstrate that the constitutional right was clearly established when the violation allegedly occurred. *Clark v. Stone*, 998 F.3d 287, 298 (6th Cir. 2021). Plaintiffs rely on *Vanderhoef* as putting the Officers' on notice that the pointing of their firearms at plaintiff Frasure and the decedent during the initial encounter violated the Fourth Amendment. (*See* Doc. 66 at PAGEID 2925). But *Vanderhoef* is readily distinguishable. There, the Sixth Circuit found that unarmed and non-threatening individuals have a clearly established right not to be held at gunpoint. 938 F.3d at 281. In *Vanderhoef*, the defendant was an off-duty, part-time

reserve officer driving home in his personal vehicle. *Id.* at 274. On the way, the plaintiff came

speeding towards him in another vehicle. *Id.* The plaintiff (with two passengers) swerved across

oncoming traffic while going around and curve, went into a ditch, hit a telephone pole, swerved

back across the road, and hit the defendant's vehicle. *Id.* The defendant got out of his vehicle

with his handgun in hand and hurried to the plaintiff's car, where the airbags had deployed and

the occupants were trying to exit. *Id.* The defendant ordered the occupants (three teenagers) out

of the car, yelling at them to put their hands up and get on the ground with his gun pointed at the

plaintiff's head for approximately two minutes. *Id.* at 275. The teenagers were entirely

compliant. *Id.* The defendant was not in uniform and never identified himself as a police

officer. *Id.* at 277. The Court found that all of the *Graham* factors favored the plaintiff: (1) the

offense was only reckless driving, (2) there was no threat to the defendant after the collision, and

(3) the plaintiff and his passengers were totally compliant. *Id.* at 277-78.

Here, the suspected crime was burglary—a serious offense—as opposed to the mere

traffic offenses at issue in *Vanderhoef*. In *Vanderhoef*, the Sixth Circuit found no viable threat

from the plaintiff, as he had just suffered a "relatively serious car accident[,]" and he and his

passengers were visible simply trying to exit the wreckage. *Id.* at 277-78. Here, by contrast, the

Officers confronted burglary suspects, who had not been checked for weapons, in the middle of

the night. Finally, the plaintiff in *Vanderhoef* and his passengers were totally compliant, even

though the officer was in plain clothes and not otherwise identifiable as law enforcement. Here,

the inverse was true: the Officers were clearly identifiable as law enforcement, and still plaintiff

Frasure and the decedent were not entirely compliant. Plaintiffs have not met their burden of

showing that the Officers' actions, even if unconstitutional, violated clearly established law.

36

Therefore, defendants' motion for summary judgment on plaintiffs' claim that the initial pointing of firearms at plaintiff Frasure and the decedent violated the Fourth Amendment is **GRANTED**, and plaintiffs' motion for summary judgment is **DENIED.**

      2.    <u>Defendant Jones' subsequent pointing of his firearm at plaintiff Frasure</u>

          a.    *Reasonableness*

After the shooting, defendants Batts returned to the rear of 320 Durrell. Defendant Batts spotted plaintiff Frasure with his flashlight and repeatedly ordered him to the ground. (Batts BWC, 00:44:21-45:07). Plaintiff Frasure did not immediately comply and approached the other vehicle in the paved area behind 320 Durrell. (Batts BWC, 00:44:21-45:07). Frasure took to one knee but then arose and leaned against the hood of the car. (Jones BWC, 00:44:44-44:58). Defendant Batts did not know if the other vehicle contained weapons, or would be used as a weapon, as plaintiff Frasure was not complying with commands. (Batts Aff., Doc. 49-6 at PAGEID 1632, ¶ 32). As plaintiff Frasure was standing with his back leaning on the hood of the vehicle, defendant Jones joined defendant Batts. Defendant Jones radioed dispatch, advising: "we got one person down in the van. They're trying to get another [garbled] out. There are still other people in the apartment, I believe." (Jones BWC 00:44:46 to 00:44:56). Defendant Jones then pointed his firearm at plaintiff Frasure and commanded him "on the ground." (*Id.* at 00:44:57-44:59). Plaintiff Frasure turned toward defendant Jones, raised his arms to his sides at above waist level and appeared to say something to defendant Jones. Before plaintiff Frasure complied with defendant Jones' command to get on the ground, defendant Jones stated, "you're gonna get shot! On the ground!" (Jones BWC, 00:45:00-03). Plaintiff Frasure replied, "why you gonna shoot me for?" but eventually kneeled in front of the vehicle. (Jones BWC, 00:45:03-

37

45:15). Defendant Jones then returned to the decedent in the van, which was still stationary against 320 Durrell with its engine running and smoking. (Jones BWC, 00:45:15-45:20). Plaintiff alleges that defendant Jones' actions at this point constituted excessive force under the Fourth Amendment.

The *Graham* factors weigh in defendant Jones' favor regarding this instance of pointing his weapon at plaintiff Frasure. The encounter still occurred in the context of a burglary investigation. It happened approximately one minute after defendant Jones' initial encounter with plaintiff Frasure, during which the attempted flight by and shooting of the decedent occurred. The circumstances present prior to the initial pointing of firearms and demonstrating an imminent threat largely remained: it was dark, defendant Jones still had not had time or an opportunity to evaluate whether plaintiff Frasure (a burglary suspect) was armed, the scene was not under control, and plaintiff Frasure did not fully comply with defendants Jones and Batts' commands. (Jones Aff. Doc. 49-5 at PAGEID 1622, ¶ 28; Jones BWC, 00:44:57-45:03).

Moreover, in a supplemental report offered in connection with defendants' supplemental motion for summary judgment, Dr. Martinelli opined that when defendant Jones pointed his firearm at plaintiff Frasure the second time, it was "consistent with recognized, accepted, applied, and trained codified law enforcement practices and standards of care in Ohio and nationally. [Defendant Jones'] display of his firearm during the detention was not a violation of Wyoming PD department policy." (Martinelli Supp. Decl., Doc. 61-1 at PAGEID 2714). Dr. Martinelli highlighted the fact that when plaintiff Frasure rose from his kneeling to standing position, it was a "pre-assault indicator" that prompted defendant Jones's "stringent force warning" that plaintiff Frasure would be shot if he did not comply. (*Id.* at PAGEID 2721-22, ¶¶

38

14(d)-(e); *see also* Jones BWC, 00:44:53-47). Plaintiffs have not presented evidence creating an issue of fact on defendants' expert opinion in this regard, which stands unrebutted. The Court finds that defendant Jones acted reasonably under the circumstances when he pointed his firearm at plaintiff Frasure, and defendant Jones did not violate plaintiff Frasure's Fourth Amendment rights.

        b.    *Clearly established*

Assuming, arguendo, defendant Jones violated plaintiff Frasure's Fourth Amendment rights, plaintiffs have not met their burden on the issue of qualified immunity. Plaintiffs again rely on *Vanderhoef* to show that the law was clearly established that defendant Jones' conduct here was unreasonable. The case is distinguishable for the reasons already discussed. Plaintiffs also argue that defendants' position urges the Court to adopt a "moment of the threat" approach to reasonableness, which the Supreme Court has rejected in favor of the totality of the circumstances test. *Barnes v. Felix*, 605 U.S. ----, 145 S. Ct. 1353, 1357 (2025). Plaintiffs argue that plaintiff Frasure "was not aggressive, [not] committing a crime, did not have a weapon and was immediately compliant." (Doc. 66 at PAGEID 2928). Contrary to plaintiffs' argument, the BWC footage shows plaintiff Frasure was not immediately compliant with defendant Batts' commands to get on the ground or with defendant Jones' command "on the ground." (Jones BWC, 00:44:57-44:59). Only after defendant Jones stated, "You're gonna get shot! On the ground!" (*id.*, 00:45:00-45:03) did plaintiff Frasure comply. Plaintiffs' argument that plaintiff Frasure was not armed or committing a crime largely credits defendant Jones with 20/20 hindsight—something courts are expressly precluded from doing. *Graham*, 490 U.S. at 396-97. "Qualified immunity shields an officer from suit when [he] makes a decision that, even if

39

constitutionally deficient, reasonably misapprehends the law governing the circumstances she

confronted. [*Saucier*, 533 U.S. at 206] (qualified immunity operates to 'protect officers from the

sometimes hazy border between excessive and acceptable force')." *Brosseau v. Haugen*, 543

U.S. 194, 198 (2004) (internal quotation marks omitted).

It is plaintiffs' burden to show that defendant Jones' pointing of his firearm at plaintiff

Frasure after the shooting violated his clearly established constitutional rights. Plaintiffs'

reliance on the *Vanderhoef* case does not satisfy that "demanding test[.]" *Chaney-Snell*, 98 F.4th

at 720. Defendant Jones is entitled to qualified immunity on this claim. Defendants' motion for

summary judgment on plaintiffs' second claim is **GRANTED**, and plaintiffs' motion for

summary judgment is **DENIED**.

     3.   <u>Deadly force</u>

        a.   *Reasonableness*

In general, "the Fourth Amendment prohibits the use of deadly force to prevent the

escape of fleeing suspects unless 'the officer has probable cause to believe that the suspect poses

a threat of serious physical harm, either to the officer or to others.'" *Latits v. Phillips*, 878 F.3d

541, 547-48 (6th Cir. 2017) (quoting *Tennessee v. Garner*, 471 U.S. 1, 1, 11 (1985)). In other

words, the second *Graham* factor (immediate threat) *must* be present for deadly force to be held

reasonable. *Id. See also Raimey*, 77 F.4th at 448 ("Under the Fourth Amendment, an officer's

use of deadly force is objectively reasonable only when there is probable cause to believe that the

suspect poses an immediate threat to the officer or to others."). The Court has already

determined that the seriousness of the suspected crime (first *Graham* factor) weighs in

defendants' favor. Plaintiffs do not dispute that the third *Graham* factor (resisting/fleeing) also

weighs in defendants' favor as it pertains to the decedent. The Court therefore focuses on the second and dispositive *Graham* factor.

In the context of deadly force against suspects in fleeing vehicles, the Sixth Circuit has explained:

> When an officer uses deadly force in that situation, we ask whether the officer had "reason to believe that the car present[ed] an imminent danger" to the lives of "officers and members of the public in the area." *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005). Deadly force is justified against "'a driver who objectively appears ready to drive into an officer or bystander with his car,' but generally not 'once the car moves away, leaving the officer and bystanders in a position of safety,' unless 'the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car.'" *Latits v. Phillips*, 878 F.3d 541, 548 (6th Cir. 2017) (quoting *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014)).

*Raimey*, 77 F.4th at 449.

The Court starts with defendant Batts and the context in which he fired his weapon. When defendant Batts reached the rear of the building, he witnessed the decedent rev the van's engine, reverse the van, and back up into trees or bushes. At the same time, the decedent failed to comply with defendant Warmack's repeated commands to stop and get out of the car. The van's tires can be heard screeching as the van began to accelerate forward and nearly struck defendant Warmack, who jumped out of harm's way. (Batts BWC 00:44:01 to 00:44:09; Batts Aff., Doc. 49-6 at PAGEID 1630, ¶ 23). Moments later, the van moved forward and drove over the grassy embankment between 320 and 322 Durrell. (Jones BWC 00:44:10 to 00:44:14). Defendant Batts heard the van's engine rev and accelerate towards him and was running toward the driveway of 322 Durrell, which he believed was the only known path for escape. (Batts Aff., Doc. 49-6 at PAGEID 1630, ¶¶ 24-25). Defendant Batts peered over his shoulder after hearing tires screeching and sensed the van gaining on him. (*Id.*, ¶ 26). Defendant Batts "saw the front

41

of the van, the grill of the van, and its headlights, looking right at me from [what] appeared to be only a handful of feet away." (*Id.* at PAGEID 1630-31, ¶ 26; Batts BWC, 00:44:12-44:14). Defendant Batts feared the van was going to crush him into the wall of 322 Durrell or, at the very least, sideswipe him because of the narrow area between 320 and 322 Durrell where he and the van were now located. (Batts Aff., Doc. 49-6 at PAGEID 1631, ¶ 27). It was at that moment that defendant Batts shot his firearm. (*Id.*, ¶ 28).

As for defendant Jones, he believed the decedent may have struck defendant Warmack. (Jones Aff., Doc. 49-5 at PAGEID 1620-21, ¶ 22; *see also* Jones BWC, 00:44:08-44:11 (defendant Jones yells repeatedly to defendant Warmack to "back up," the van accelerates towards defendant Warmack, and tires can be heard screeching)). As the van continued to accelerate forward, defendant Jones "was afraid that [he] might get sideswiped by the van . . . and . . . was certain that [defendant] Batts was about to be struck by the van." (Jones Aff., Doc. 49-5 at PAGEID 1620, ¶ 25; *see also* Jones BWC, 00:44:11-14 (reflecting defendant Batts directly in front van, with his back facing the van, followed by the sound of a revving engine and screeching tires). It was at this time that defendant Jones fired his weapon. (*Id.*).

Defendant Batts and defendant Jones had probable cause to believe that the decedent posed an immediate threat of serious harm. Both observed the decedent drive the van erratically. Both observed the decedent ignore repeated commands to stop and get out of the car. Both believed the decedent may have hit (or nearly hit) defendant Warmack.[16] Defendant Batts followed the only path he knew out of the area (the route from which he entered the scene), after

---

[16] Even plaintiff Frasure shared this belief. (*See* Illing Aff., Ex. 4, 04:06:47-57) (recorded interview with plaintiff Frasure) (noting that "the decedent "almost" hit defendant Warmack with the van after backing into the bushes)).

which he heard the van's engine rev and saw it following a similar path through the limited space between 320 and 322 Durrell. Defendant Jones witnessed the van follow a similar path to defendant Batts and was certain defendant Batts would be struck.[17] Consistent with these Officers' perspectives, Mr. Guest, who initially called police, observed the incident from his adjacent home and "had no doubt in [his] mind that the van was traveling quickly and certainly not casually or carefully, especially considering the small area behind 320 Durrell." (Guest Aff., Doc. 49-14 at PAGEID 1846). Under the totality of the circumstances, both defendants Batts and Jones had probable cause to believe the van presented an imminent danger to defendant Batts' safety and life.

The unrefuted expert opinions are also consistent with the conclusion that defendant Batts and defendant Jones had probable cause to believe the decedent posed an immediate threat. Upon review of the evidence, including the BWC footage and the Officers' statements, Mr. Gilbertson opined:

> based upon the totality of the circumstances that existed, officer statements, civilian witness statements, officer BW[C]s, and the evidence made available to me, when viewed within my personal education, training, and experience, I have no reason to doubt that all three officers were in reasonable fear of sustaining serious bodily injury or death from a weaponized 4300-pound vehicle driven by [the decedent]. Their actions in firing weapons is in line with national standards and practices.

(Gilbertson Decl, Doc. 49-18 at PAGEID 1921). Likewise, Dr. Martinelli opined that the Officers' "determination that they had probable cause to believe that [the decedent] was committing a dangerous and imminent life-threatening felony in their presence was consistent with recognized, accepted, applied and trained codified law enforcement practices and standards

---

[17] Here too, plaintiff Frasure shared similar observations immediately following the incident. (*See* Illing Aff., Ex. 04:12:27-13:02 and 04:13:01-13:12 (indicating the decedent may have nearly run over defendant Batts)).

of care in Ohio and nationally." (Martinelli Decl., Doc. 49-10 at PAGEID 1767). Mr. Leiloglou determined that all shots fired by defendants Batts and Jones were fired within less than one second of one another, which is consistent with the conclusion that they each appreciated the same threat. (Leiloglou Decl., Doc. 49-15 at PAGEID 1851, ¶ 7(c)).

Other portions of Dr. Martinelli's report lend further support to the conclusion that defendant Batts and defendant Jones acted objectively reasonably when they used deadly force on the decedent. Dr. Martinelli explained: "In ideal conditions, it would take an average police officer at least 1.96 seconds to 2.74 seconds to transition from experiencing a stimulus in the environment to thereafter carrying out some action." (Martinelli Decl., Doc. 49-10 at PAGEID 1715-16, ¶ 20). Dr. Martinelli opined that the van moved at a rate of approximately 8.5 mph (12.5 feet per second) as it crossed the grassy embankment. (Martinelli Decl., Doc. 49-10 at PAGEID 1787). Defendant Batts was 16.9 feet away from the bumper of the van and defendant Jones was 15.6 feet from the front right corner of the van. (*Id.*). By the time defendant Jones fired the first shot about a second later, the front right corner of the van was 8.5 feet away from him and moving at about 9.5 feet per second. (*Id.* at PAGEID 1788 & nn.198-99). Just before defendant Batts fired his first shot, the distance between him and the van went from 16.9 feet to 14.3 feet. (*Id.* at PAGEID 1787-88 & nn.198, 200). Given the van's speed, defendant Batts had approximately 1.5 seconds at most to observe the approaching vehicle, assess the danger it posed, determine an appropriate response, and take action; defendant Jones had less than one second. (*Id.* at PAGEID 1788). Dr. Martinelli opined that there was "less than an adequate amount of time to perceive, decide, and respond, no matter the response." (*Id.* at PAGEID 1716, ¶ 21). His photogrammetric analysis showed that defendants Batts and Jones "had less than a

44

second . . . to make deadly force decisions" and "given the officers' observation, orientation to decision-making response cycles and their physical environment, it would be unreasonable to expect" them to have had "time to jump out of the way of the moving minivan." (*Id.* at PAGEID 1790).

Plaintiffs do not raise a genuine dispute of material fact as to whether defendants Batts and Jones reasonably believed the van posed an imminent threat of serious physical harm to defendant Batts. First, plaintiffs' note that the decedent "blew the horn indicating he was not going to run over someone with the vehicle." (Doc. 48 at PAGEID 1499; *see also* Doc. 58 at PAGEID 2040). But the Court cannot charge the Officers with knowledge of what the decedent *intended* to convey. *See Ashford v. Raby*, 951 F.3d 798, 802 (6th Cir. 2020) ("But we must consider what was reasonable from the *officer's* perspective, not the suspect's. . . . Here, even if [the police officer] heard [the plaintiff's] explanations, he could not peer into [the plaintiff's] heart to assess his good faith.") (citing *Graham*, 490 U.S. at 396). Next, plaintiffs argue that defendant Jones said in the investigative interview shortly after the incident that he knew the decedent was attempting to flee, but "later statements" by defendants Jones and Batts indicated they did not know if he was trying to flee. (Doc. 58 at PAGEID 2040). Even if there is a contradiction (plaintiffs do not direct the Court to the "later statements" they reference to compare), however, this does not create an issue of fact on the question of imminent threat of serious harm. A reasonable officer under the circumstances would have appreciated an imminent threat whether or not they *also* believed the decedent was fleeing.

Plaintiffs next seem to imply that the Court should discount plaintiff Frasure's statements during his investigative interview demonstrating agreement with the reasonableness of the

45

Officers' use of deadly force[18]; but they do not offer evidence to create a fact issue on how defendants' Jones and Batts reasonably perceived the impending threat posed by the decedent. (*See* Doc. 58 at PAGEID 2042). "For a case to survive summary judgment, it must contain two sets of facts in conflict with each another, not merely evidence that may cast doubt on one set of facts. . . . [A] plaintiff can only overcome qualified immunity and create an issue for the jury to resolve if he presents a second, obviously conflicting versions of the facts." *Labensky v. Cornwell*, 763 F. Supp. 2d 921, 928 (S.D. Ohio 2010) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 915 (6th Cir. 2009)).

Plaintiffs also argue that defendants Batts and Jones created their vulnerable positions by approaching the decedent and running in the directions they did, which should factor into the reasonableness analysis. (*See* Doc. 58 at PAGEID 2039-41). Plaintiffs rely on out-of-circuit authority for this proposition. *See Abraham v. Raso*, 183 F.3d 279, 295 (3d Cir. 1999) (citing *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) (an officer "would have unreasonably created the encounter that ostensibly permitted the use of deadly force" if the officer jumped in front of the decedent's car after it began accelerating). The Sixth Circuit, however, has expressly declined to take this approach. *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 673 (6th Cir. 2020) (quoting *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 365 (6th Cir. 2017) ("We do not scrutinize whether it was reasonable for the officer to create the circumstances" leading to the use of force)). The rationale for this approach is as follows:

The time-frame is a crucial aspect of excessive force cases. Other than random

---

[18] These include plaintiff Frasure's statements that the decedent nearly hit defendant Warmack, the decedent almost ran over defendant Batts, and that plaintiff Frasure would have done the same thing the Officers did if in their positions. (*See* Illing Aff., Ex. 4 (recorded interview with plaintiff Frasure) at 04:06:52-55, 04:12:27-13:02, and 4:13:01-13:12).

46

> attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406-07 (6th Cir. 2007) (quoting *Dickerson v. McClellan,* 101 F.3d 1151, 1161 (6th Cir. 1996)).[19]

Plaintiffs also point to the undisputed facts that several areas of 320 Durrell were lit up when officers arrived, voices—including a child's voice—were audible, and defendant Batts suggested calling up to the people inside. (*See* Batts Dep., Doc. 41-1 at PAGEID 617, 58:15-22 ("I recall seeing it was safe to call them out of the building being a window was open.")). Nevertheless, officers have a "right to rely on dispatch information. . . ." *Dorsey v. Barber*, 517 F.3d 389, 396 (6th Cir. 2008). And it is undisputed that defendants Batts and Jones heard defendant Warmack call "back" approximately 10 seconds after defendant Batts suggested ordering the individuals in the building out. Only after that point—a point at which they had been dispatched to a burglary in progress with no actual knowledge of the underlying call by Mr. Guest and with their fellow officer summoning them "back" and repeating orders to a burglary suspect—did the use of deadly force occur. It is that later segment that matters for purposes of the objective reasonableness analysis. *See Chappell*, 585 F.3d at 909 ("Because it is the reasonableness of the 'seizure' that is the issue, not the reasonableness of the detectives' conduct

---

[19] The Supreme Court in *Barnes* expressly declined to weigh in on "whether or how an officer's own 'creation of a dangerous situation' factors into the reasonableness analysis." *Barnes*, 145 S. Ct. at 1360. *Barnes* considered a separate issue: whether the objective reasonableness inquiry under the Fourth Amendment is limited to the "moment of threat." The Court held it was not, because the Court must consider the totality of the circumstances—including facts and circumstances related to the incident. *Id.* at 1357-58.

47

in time segments leading up to the seizure, the district court properly held that any fact issues relating to the issuance of the warrant and initial entry into the Chappell residence are immaterial.").[20]

Plaintiffs also seems to suggest the fact that defendant Jones did not fire his weapon when he feared the decedent might run into defendant Warmack shows he acted unreasonably when he later fired to protect defendant Batts. (*See* Doc. 48 at PAGEID 1497-98). Plaintiff argues the fact that defendant Jones took different actions at different times shows he was "making critical calculations." (*Id.*). If anything, however, this seems to reflect that defendant

---

[20] This Court has not found *Barnes* inconsistent with this Sixth Circuit authority:

> In cases involving multiple uses of force, courts in this circuit analyze each claim separately. *Id.* In doing so, courts should "identif[y] the seizure and procee[d] to examine whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create those circumstances." *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (quotation marks and citation omitted). "However, [courts] may consider 'the moments preceding [a] [use of force]' as part of the context of that [use of force]." [*Gaddis ex rel. Gaddis v. Redford Twp*., 364 F.3d 763, 772 (6th Cir. 2004)] (quoting *Dickerson*, 101 F.3d at 1162). Because "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones," the totality of the circumstances test for excessive force "has no time limit." *Barnes v. Felix*, No. 23-1239, slip op. at 5, 605 U.S. ---- (2025).

*Lucas v. City of Reynoldsburg*, No. 2:23-cv-689, 2025 WL 1557946, at *5 (S.D. Ohio June 2, 2025). Similarly, in *Heeter v. Bowers*, No. 2:20-cv-6481, 2025 WL 2098007 (S.D. Ohio July 25, 2025), the Court granted a motion to reconsider its motion in limine excluding arguments and evidence regarding alleged bad tactics or planning that lead to deadly force based on *Barnes*. In doing so, however, it reiterated:

> To be sure, "[t]he Fourth Amendment . . . does not require police officers to take the better approach[,] . . . only that they take a reasonable approach." *Cook v. Bastin*, 590 Fed.Appx. 523, 528 (6th Cir. 2014). Indeed, "so long as 'a reasonable officer could have believed that his conduct was justified,'. . . an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless,'" does not, **_on its own_**, establish a Fourth Amendment violation. *See Roell v. Hamilton Cnty., Ohio/Hamilton Cnty. Bd. of Cnty. Commissioners*, 870 F.3d 471, 486 (6th Cir. 2017).

*Id.* at *4.

Jones made "split-second judgments" in a situation that was "tense, uncertain, and rapidly evolving. . . ." *Graham*, 490 U.S. at 397. Whether or not an officer's action was reasonable does not depend on it being "the best technique available at the time." *Ashford*, 951 F.3d 798. *Cf. Burghardt v. Ryan*, 560 F. Supp. 3d 1093, 1111 (N.D. Ohio 2021) ("[E]ven if [an officer's] initial instinct was to retreat—instead of stopping the threat by firing—this does not make [other officers' actions otherwise] unreasonable. The reasonableness standard asks whether a reasonable officer would have thought his actions were reasonable, not whether every reasonable officer would."), *aff'd*, No. 21-3906, 2022 WL 1773420 (6th Cir. June 1, 2022).

Finally, plaintiffs argue the decedent was "shot in the back of the head," which demonstrates the van had already passed defendants Batts and Jones and therefore could not have been a threat. (Doc. 48 at PAGEID 1498). Plaintiffs point to *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005), as "directly on point. . . ." (Doc. 58 at PAGEID 2042). In *Cupp*, the decedent had been arrested by the defendant police officer for making harassing telephone calls. *Cupp*, 430 F.3d at 769. The police officer cuffed the decedent's hands behind his back and put him in the back seat of his cruiser. *Id.* The police officer also patted down the decedent for contraband. *Id.* The police officer then left his cruiser unattended with the engine running, keys in the ignition, and the decedent in the back seat. *Id.* The decedent climbed into the front seat and took control of the cruiser. *Id.* The police officer argued that the decedent "directed the cruiser at him and [a bystander], or at least [the police officer] perceived the events in this manner" and the shooting was in self-defense. *Id.* at 770. The plaintiffs argued, by contrast, that the decedent "was merely trying to flee in the cruiser and [the police officer] shot [the decedent] under circumstances of no threat to [the police officer] or others." *Id.* The Sixth Circuit found an issue of fact as to whether

49

the officer acted reasonably :

> Even viewing the events in the heat of the moment, without 20/20 hindsight, a jury could conclude that a reasonable officer in Dunn's position was never in any danger. Officer Dunn's decision was certainly a "split-second judgment" in a circumstance that was "tense, uncertain, and rapidly evolving." *Graham,* 490 U.S. at 397, 109 S. Ct. 1865. Rutherford [a bystander] said that Dunn was "running towards the patrol car," and Rutherford's diagram shows that Dunn took "four or five steps" towards the left side of the patrol car. The evidence would support a jury finding that Dunn was never in the line of flight based on Rutherford's statement that Dunn "was not in front of the vehicle" when he fired on it. The autopsy report that shows the bullet entered the back of Smith's head, behind his ear, at a slightly back-to-front angle. This report indicates that the police cruiser was likely past Dunn as he fired. Thus, it provides further evidence to support a jury decision that a reasonable officer in Dunn's position would not have felt he was in danger and had the opportunity to choose not to use deadly force to protect himself or others. Rutherford stated he was in no danger. The record does not establish the presence of any bystander other than Rutherford whose physical safety could have been endangered by Smith's actions.

*Cupp*, 430 F.3d at 774. The court distinguished the facts before it from situations in which "a dangerous situation evolved quickly to a safe one before the police officer had a chance to realize the change" because it found a "jury could conclude that [the police officer] was not in any danger in the first place." *Id.* at 774-75.

There are several distinguishing features between *Cupp* and the facts at bar. The suspected crime here was burglary, as opposed to the harassing phone calls at issue in *Cupp*. The decedent in *Cupp* had been patted down and was cooperative, while the decedent here had not been checked for weapons and repeatedly failed to comply with the Officers' commands. The plaintiffs in *Cupp* had presented evidence that the police officer had lied when recounting the scene; there is no such evidence here. *Id.* at 770. In *Cupp*, there was evidence that the police officer was running up to the side of the police cruiser and was never in front of the vehicle. *Id.* at 774. Here, defendants Jones and Batts were in front of the van when it began accelerating

50

forward and when defendant Jones fired his first shot and defendant Batts fired the first of three shots in rapid succession.  (Doc. 49-15 at PAGEID 1875, Figures 2 and 3 at PAGEID 1857-58).[21]  Finally, in *Cupp*, there was evidence showing that the police officer shot after his cruiser had already passed him*, and* there was *no* evidence that any other bystanders were at risk.  This case, however, is not one where "a jury could conclude that [defendant Batts] was not in any danger in the first place."  *Smith,* 430 F.3d at 775.  The undisputed evidence shows that defendant Batts fired his first shot when defendant Batts was in front of the decedent's van.  His second and third shots "did not come at a time after which a reasonable officer would think the threat had passed."  *Mullins v. Cyranek*, 805 F.3d 760, 768 (6th Cir. 2015).  Instead, defendant Batts' second and third shots "came within the time frame in which a reasonable officer could have acted under the perception" that the decedent's van still posed an imminent threat of harm or death.  *Id*. (citing *Untalan v. City of Lorain,* 430 F.3d 312, 315 (6th Cir. 2005)).  Defendant Batts fired his first, second and third shots approximately 0.21 seconds, 0.32 seconds, and 0.23 seconds after defendant Jones fired the first shot.  (Doc. 49-15 at PAGEID 1874).  Defendant Batts "was faced with a rapidly escalating situation, and his decision to use deadly force in the face of a severe threat to himself . . . was reasonable."  *Mullins*, 805 F.3d at 767 (citing *Untalan,* 430 F.3d at 315-16 (finding police officer's use of deadly force reasonable where only a "few seconds" passed between when assailant lost control of knife and when officer shot assailant); *Troupe v. Sarasota Cnty.,* 419 F.3d 1160, 1168 (11th Cir. 2005) (finding that 3-5 seconds was a short enough time for the use of deadly force to stop someone who previously endangered police

---

[21] At the time of defendant Jones' first shot, he was approximately 8.5 feet away from the right front fender of the van.  At approximately 0.2 seconds before defendant Batts' first shot, he was approximately 14.3 feet away from the front of the van.  (Doc. 49-15 at PAGEID 1875).

and bystanders even if, in hindsight, the facts show that members of the S.W.A.T. Team could have escaped unharmed); *Robinson v. Arrugueta,* 415 F.3d 1252, 1256 (11th Cir. 2005) (holding that an officer's decision to shoot within a reaction time of 2.72 seconds was reasonable, even if hindsight showed that the officer could have escaped unharmed); *Pace v. Capobianco,* 283 F.3d 1275, 1282 (11th Cir. 2002) (justifying use of deadly force in the "very few seconds" after a serious threat had subsided); *McLenagan v. Karnes,* 27 F.3d 1002, 1007-08 (4th Cir. 1994) (justifying the use of deadly force against an unarmed, handcuffed suspect when an officer reasonably believed that a fellow officer had seen a gun in the suspect's hands, in large part because the officer "had no time to consider anything at all")).

While plaintiffs point to evidence that the decedent was shot in the head behind his left ear, suggesting the danger had already passed, plaintiffs present no evidence showing how the decedent's head was oriented in space when he was shot. More importantly, unrefuted expert evidence supports the conclusion that the decedent had driven directly towards defendants Batts and Jones in the moments leading up to the deadly force, and it was unreasonable to expect that the Officers had sufficient time to jump out of the way. (Martinelli Decl., Doc. 49-10 at PAGEID 1789-90). There is no question of fact that the decedent's reckless disregard for the safety of the officers in attempting to escape posed an imminent threat under the totality of the circumstances, and their use of deadly force was reasonable.

   b.   *Clearly established*

Even if the Court concluded otherwise, plaintiffs are still required to show that defendants Jones and Batts' use of deadly force violated clearly established law. As discussed above, they must show this via a "highly specific right or a case with analogous facts." *Chaney-*

52

*Snell*, 98 F.4th at 720.

Plaintiffs rely on *Cupp* to show that defendants Batts and Jones' use of deadly force violated clearly established law. As discussed at length above, *Cupp* is distinguishable in several ways: the severity of the crime being investigated, the conduct of the suspect, and—most importantly—the threat to law enforcement officers.

Although not cited by plaintiffs, comparison to other cases with fleeing suspects in vehicles show that this case falls within the "hazy border between excessive and acceptable force" in which qualified immunity operates to protect officers. *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

In *Raimey*, the decedent had gone to municipal court to pay a traffic fine, court officials notified him of an active warrant, and he fled. *Raimey*, 77 F.4th at 445. In the process, the decedent hit a probation officer pursuing him with his car door as he pulled away. *Id.* Other officers were dispatched, who followed the decedent going at or below the speed limit. *Id.* Ultimately, one the officers shot and killed the decedent once the decedent was blocked in by police vehicles. *Id.* The plaintiff presented evidence showing that when officers fired on the decedent in the vehicle, the decedent had been "travelling very slowly—if at all—and decreasing his speed. . . ." *Id.* at 446. In addition, "unrebutted forensic analysis" showed that the decedent's vehicle was not pointed at the firing officer, who was to the side of the decedent's vehicle. *Id.* The court declined to grant the officer qualified immunity, explaining:

> the facts taken in the light most favorable to Raimey show that no person at the scene was in danger when Mannella used deadly force. At the time Mannella fired, Burroughs was driving very slowly and braking to comply with Mannella's orders to stop, while Mannella himself was either not in the path of the vehicle or could easily have stepped away from the slowly braking car. The officers also never saw

53

> Burroughs drive in a reckless or dangerous manner leading up to the shooting—instead, their testimony establishes that he drove under the speed limit, did not risk hitting or attempt to hit any cars, officers, or pedestrians, avoided hitting police vehicles by making a controlled stop, and was not facing Mannella head on but rather was to the side of Mannella when Mannella fired. Based on the facts found by the district court, a reasonable officer in Mannella's position would not have had reason to believe that Burroughs posed an imminent danger.

*Id.* at 450. Here, by contrast, defendants Jones and Batts witnessed the decedent driving erratically and nearly hit defendant Warmack after ramming into an obstruction while trying to back up. In addition, the van in this case was positioned towards defendant Batts, and defendant Jones saw defendant Batts directly in front of the accelerating van. Unlike *Raimey*, both Officers had reason to believe from the proximity of the accelerating van to defendant Batts that the decedent posed an imminent danger to defendant Batts.

In *Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008), officers went to the decedent's house to execute a search warrant. *Id.* at 477. Officers had information that the decedent was violent, paranoid, kept various weapons, and was often high. *Id.* Officers located the decedent, who was driving the speed limit. *Id.* After following him then activating their sirens, a first officer pulled the decedent over and parked a few feet behind the decedent. *Id.* A second officer pulled in front of both vehicles at a 45 degree angle with the decedent's vehicle. The decedent's vehicle was essentially "sandwiched" between the two officers and a ditch on the other side. *Id.* Both officers walked toward the decedent's vehicle and ultimately shot. *Id.* at 478. The first officer claimed he feared the decedent was going to back into him; the second officer believed the decedent was going to pull forward and crush him against his own vehicle. *Id.* The Court declined to grant the officers qualified immunity. It pointed to eyewitness and expert testimony offered by the plaintiffs demonstrating that the officers were not in danger. *Id.* at 482. That

same eyewitness testified that the decedent's vehicle was moving very slowly; a few seconds passed between when it came to a stop and when the first officer began shooting; and several more second passed between the first officer's shots ending and the second officer's shots beginning. *Id.* at 482-83. It concluded "each [officer] had an adequate opportunity to realize before shooting that the [decedent's vehicle] had stopped moving and that no one was in its path." *Id.* at 483. Here, by contrast, there is no evidence that defendant Jones or defendant Batts had such an adequate opportunity.

In *Godawa v. Byrd*, 798 F.3d 457, 460 (6th Cir. 2015), a bike patrol officer approached the decedent's vehicle, suspecting him of underage drinking. *Id.* at 461. The decedent agreed to submit to a field sobriety test, and the officer told the decedent to "hold on" while he requested backup. *Id.* Meanwhile, the decedent began backing out of the parking spot he was in and appeared to hit the officer's bike. *Id.* The officer yelled at the decedent to stop without success. *Id.* The officer then testified that he ran along the driver's side to the front of the vehicle and ordered the decedent to stop the car. *Id.* At this point, he was positioned to the right of the decedent's vehicle's front passenger side, and the vehicle was temporarily stopped. *Id.* The officer was then hit by the decedent's vehicle as it proceeded towards the exit at 5-10 miles per hour. *Id.* at 461-62. The officer regained his balance, walked alongside the vehicle, and then shot through the back passenger-side window. *Id.* at 462. The court declined to grant the officer qualified immunity because "it appeared possible—and arguably likely—that [the officer] was moving toward the car with his gun drawn in the moments before the apparent impact" and that the officer had initiated the contact. *Id.* at 463, 465 (noting that witness testimony supported this version of the facts). The court emphasized that the plaintiffs presented evidence that the

55

decedent never attempted to hit the officer or drive in a way that endangered anyone's life, and that the officer was positioned near the rear passenger side when he fired his weapon.  *Id.* at 465-66.   Here, by contrast, the video evidence shows defendant Warmack was directly in front of the van when the van accelerated forward.  Both defendants Jones and Batts perceived the imminent threat to defendant Warmack and urged him repeatedly to "back up."  Once the van passed defendant Warmack, it accelerated towards defendants Jones and Batts.  Defendant Batts turned and ran away from the van as the van accelerated and gained on him, with defendant Batts directly in front of the van.  There is unrefuted expert testimony that it would be unreasonable to expect that defendants Batts and Jones could jump out of the way of the moving van.  (Martinelli Aff., Doc. 49-10 at PAGEID 1790).

The factor in this case distinguishing it from all of these cases is that the decedent gave the Officers various "indication[s] suggesting that [he] pose[d] more than a fleeting threat." *Gordon v. Bierenga*, 20 F.4th 1077, 1085 (6th Cir. 2021) (quoting *Hermiz v. City of Southfield*, 484 F. App'x 13, 17 (6th Cir. 2012) (emphasis deleted)).  As is clear from the video recordings of the incident, the decedent repeatedly disobeyed orders from the Officers (whose status as police officers was obvious), rammed his vehicle into an obstruction, and accelerated in the direction of three officers.

*Burghardt v. Ryan*, 560 F. Supp. 3d 1093, 1111 (N.D. Ohio 2021), *aff'd*, No. 21-3906, 2022 WL 1773420 (6th Cir. June 1, 2022), is perhaps the most factually similar case to the case at bar.  Therein, the officers were responding to a theft in progress in early morning hours.  *Id.* at 1097.  One of the officers spotted a van that appeared to match the vehicle relayed by the dispatch.  *Id.* at 1099.  As soon as the officer pulled behind the van, the occupants turned the

lights and engines off and pretended to be asleep.  *Id.* at 1099-1100.  At this point, other officers arrived to investigate, and they decided to try to enter the vehicle.  *Id.* at 1101.  The officers began commanding the two occupants out, but they refused to comply with this and other commands—having decided, instead, to flee.  *Id.* at 1101.  Eventually, while the officers tried to gain entry, the vehicle's occupants started the vehicle, and quickly accelerated backwards away from officers and into one of the officers' cruisers.  *Id.*  As one of the officers ran away from the vehicle, two other officers fired at the vehicle.  *Id.*  The court found that the officers were entitled to qualified immunity because the vehicle's occupants (suspects in an attempted theft) were disobeying commands, and the occupants intended to flee authorities and leave the scene, which "elevated the level of misconduct."  *Id.* at 1110 (discussing *Bushrod v. Dist. of Columbia*, No. 1:18-cv-2462, 521 F. Supp. 3d 1, 21 (D.D.C. Feb. 22, 2021)).  The court also found that the vehicle's occupants' intention to maneuver around the officers' cruisers and others at the scene did not matter; what mattered was whether the officer had reason to believe there was danger from that officer's viewpoint.  *Id.*

At bottom, to defeat a claim of qualified immunity, "[t]he law must have been so clear that every reasonable officer in [defendants Jones and Batts'] shoes would have recognized that the force used was excessive—and not just in the abstract but in the precise situation [defendants Jones and Batts] w[ere] facing."  *Ashford*, 951 F.3d at 801.  The Court concludes neither *Cupp*, nor any of the other Sixth Circuit authority the Court has discussed above, is sufficiently analogous to satisfy plaintiffs' burden on the defense of qualified immunity.

Therefore, defendants' motion for summary judgment is **GRANTED** on plaintiffs' Fourth Amendment deadly force claim against defendants Jones and Batts, and plaintiffs' motion

for partial summary judgment is **DENIED**.

      D.    <u>Municipal liability claims</u>

As an initial matter, the Court has determined that defendants Warmack, Jones, and Batts did not violate plaintiff Frasure or the decedent's Fourth Amendment rights.  Therefore, the claims against the City fail as a matter of law.  *See Scott v. Clay Cnty., Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000) ("[O]ur conclusion that no officer-defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well.").

Assuming, arguendo, there was a violation of plaintiff Frasure or the decedent's constitutional rights, defendants are nevertheless entitled to summary judgment on plaintiffs' municipal liability claims.  In *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978), the Supreme Court held that a government entity may be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent an official policy, inflicts the injury. . . ." *Id.* at 694.  For a successful *Monell* claim, plaintiff must demonstrate "(1) that a violation of a federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen." *Bright v. Gallia Cnty.*, 753 F.3d 639, 660 (6th Cir. 2014) (citing *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008)). The City must be "the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).

A plaintiff may establish an entity's liability under § 1983 by making one of the following demonstrations: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence

of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Osberry v. Slusher*, 750 F. App'x 385, 397 (6th Cir. 2018) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). In addition to official policies, *Monell* contemplated liability that flows from both written and unwritten policies or customs, provided that they are "persistent and widespread. . . ." *Monell*, 436 U.S. at 691 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167 (1970)).

Failure to train and failure to supervise claims require a showing of deliberate indifference. *See Amerson v. Waterford Twp.*, 562 F. App'x 484, 490 (6th Cir. 2014) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (failure to train), and *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010) (failure to supervise)). *Cf. North v. Cuyahoga Cnty.*, 754 F. App'x 380, 385 n.2 (6th Cir. 2018) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365-66 (6th Cir. 1993) for the proposition that "the deliberate indifference test is used to analyze failure-to-train claims but not affirmative policy or custom claims"). Deliberate indifference, in turn, "*typically* requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures." *Amerson*, 562 F. App'x at 490 (citing *Miller v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005)) (emphasis added).

### 1. *Ratification*

In this claim, plaintiffs allege that the City ratified the Officers' unconstitutional actions in a February 3, 2023 press conference. A plaintiff may succeed on a ratification theory of municipal liability by showing that either 1) an official with final policymaking authority ratifies a subordinate's constitutional actions, *see Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th

Cir. 1993),[22] or 2) a municipality failed "to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 882 (6th Cir. 2020). *See also Rideout v. Shelby Twp.*, 691 F. Supp. 3d 816, 829 (E.D. Mich. 2023) (citing *Scott v. Louisville/Jefferson Cnty. Metro Gov't*, 503 F. Supp. 3d 532, 537-38 (W.D. Ky. 2020)) (explaining that plaintiffs may use either method to show ratification and, therefore, plaintiffs need not always show proof of a pattern or custom for this theory of municipal liability).

In their motion for summary judgment, defendants argue that plaintiffs have failed to identify the final decision-making authority who ratified the Officers' allegedly unconstitutional actions. They also argue that plaintiffs do not point to prior findings of unconstitutionality prior to this incident, and the alleged ratification occurred after the incident at issue; therefore, ratification could not have caused the harm in this case. Defendants further argue that plaintiffs cannot base this claim on the failure to investigate or punish unlawful behavior without evidence of a history of such conduct.

Plaintiffs offer only the following statements in response:

A plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct. *Brown v. City of Wyoming,* 2024 U.S. App. LEXIS 31173, *1, Sixth Circuit, pages 5 &[ ]6. The City ratified the officers['] behavior by their failure to train and supervising officers, which has become a policy and custom over the course of years.

(Doc. 58 at PAGEID 2052). Plaintiffs do not elaborate on their ratification claim or offer any evidence to support such claim.

---

[22] The *Feliciano* court also noted, however, that "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification. [*City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988) (plurality opinion)]. Otherwise, the City would be liable for all of the discretionary decisions of its employees, and this would be indistinguishable from *respondeat superior* liability." *Id.* at 656.

At the summary judgment stage, plaintiffs' vague response offers little insight into their theory of ratification, let alone evidence supporting it. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995)) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). Moreover, the only specific evidence offered related to this theory (the February 3, 2023 press conference), took place "only after the putative violation occurred, which means that the [City] itself did not cause it." *Campbell v. Riahi*, 109 F.4th 854, 862 (6th Cir. 2024) (citing *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 496 (6th Cir. 2020)). Therefore defendants' motion for summary judgment on plaintiffs' ratification claim is **GRANTED**.

### 2. *Failure to train/supervise*

Plaintiffs allege that the City's training policies "were not adequate to train its officers to handle the unusual and recurring situations with which they must deal" and the City "was deliberately indifferent to the obvious consequences of its failure to train its officers adequately." (Doc. 52 at PAGEID 1996, ¶¶ 54-55).

A plaintiff bringing a *Monell* claim based on inadequate training or supervision "must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018) (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*,

455 F.3d 690, 700 (6th Cir. 2006)). While proof of a pattern of prior unconstitutional conduct is typically necessary to support the deliberate indifference element of this of claim, liability may also be appropriate without such a pattern "in a narrow range of circumstances" where constitutional violations are "a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Id.* at 903 (quoting *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 739 (6th Cir. 2015)).

The Court's prior determination that clearly established law did not govern any of plaintiffs' constitutional claims is dispositive of plaintiff's municipal liability claims based on the deliberate indifference element of the claim. *See Riahi*, 109 F.4th at 862 (quoting *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 994 (6th Cir. 2017) (internal quotation marks omitted)) ("[A]municipality 'cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established.'"). Defendants are therefore entitled to summary judgment as it pertains plaintiffs' *Monell* claims based on the failure to train or supervise.

Even leaving that conclusion aside, plaintiffs fail to present evidence creating a genuine issue of fact that the training the Officers received was inadequate. As it pertains to the failure to train theory, plaintiffs appear, primarily, to highlight what they perceive as deficiencies in Ms. Brady's qualifications and the date, format, and topics of the training completed by defendants Jones and Batts. Plaintiffs conclude: "[The City's police department] does not have a training manual. The [City's police department] shows little commitment to training officers, evident from [Ms. Brady's] insufficient training and the heavy reliance on online courses for all officers. The excessive force used on January 30, 2023 is a direct result of failure to train." (Doc. 58 at

62

PAGEID 2047-48).

But these alleged deficiencies are, in effect, merely plaintiffs' opinions and not evidence. They do not actually rebut the expert evidence provided by defendants[23] with evidence of their own reflecting the contents of a constitutionally adequate training program.  Plaintiffs do not offer any historical evidence reflecting the failure to train.  Therefore, they must rely on the single-incident theory.  Under that theory:

> showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.  [*Connick v. Thompson*, 563 U.S. 51, 68 (2011)].  "'[P]rov[ing] that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct' will not suffice.'"  *Id.* (quoting [*City of Canton, Ohio*, 489 U.S. at 391)].

*Hicks v. Scott*, No. 1:16-cv-621, 2023 WL 3171675, at *7 (S.D. Ohio Mar. 31, 2023), *aff'd*, No. 23-3383, 2024 WL 4360652 (6th Cir. Oct. 1, 2024).  Plaintiffs seem, however, to do just that—emphasizing defendant Warmack's testimony that there were not dedicated classes of a particular

---

[23] Dr. Martinelli opined that there is "no evidence" that the City "(a) failed to properly train the Officers, (b) was negligent or deliberately indifferent toward [plaintiff Frasure] or [the decedent], (c) the City had informal or formal customs and practices, or (d) ratified any alleged constitutional violations."  (Doc. 49-10 at PAGEID 1714, ¶ 14(f)). Dr. Martinelli stated:

> 8. Training records for Officers Warmack, Batts and Jones have been reviewed.  All three officers graduated from an accredited Ohio Peace Officers Academy.  All three officers had participated in periodic use of force/deadly force training while employed as officers.  All three officers had taken Legal Updates and a Use of Force/Deadly Force & Legal Guidelines course months prior to this incident.

> 9. A review of the Wyoming PD Use of Force/Deadly Force policies found that the department participates/subscribes to Lexipol which is used by over 7,000 law enforcement agencies nationwide.  Lexipol policies are considered to be nationally recognized, accepted, applied and trained law enforcement practices consistent with nationally recognized and trained federal/state court rulings.

(*Id.* at PAGEID 1798).  *See also* Doc. 40-2 at PAGEID 530-532 (defendant Warmack's interrogatory responses regarding his training); Doc. 41-2 at PAGEID 655-658 (defendant Batts' interrogatory responses regarding his training); Doc. 42-2 at PAGEID 779-783 (defendant Jones' interrogatory responses regarding his training).

format "on how to respond to a burglary in progress, excessive force, fleeing suspects, 911 call or de-escalation. . . ."  (Doc. 58 at PAGEID 2045).  *Cf. Connick*, 563 U.S. at 68 ("But failure-to-train liability is concerned with the substance of the training, not the particular instructional format.").  That same testimony reflects that, while the training was not a "specific" class, defendant Warmack had classroom and practical training on each of those topics.  (*See* Warmack Dep., Doc. 40-1 at PAGEID 476-79).  The inadequacies referenced by plaintiffs include the format of training (online vs. in-person), the Officers' levels of experience, and the types of courses offered are opinions that do not raise a genuine issue of material *fact* as to the adequacy of training or offer a framework upon which the Court might gauge the adequacy of police officer training.

Plaintiffs also point to allegedly inadequate aspects of each individual officer's training—for example, defendant Batts' testimony that he did not consider pointing his weapon to be a use of force and that some of defendant Jones' training was done many years ago.  (*See* Doc. 58 at PAGEID 2046-47).  But again, anecdotal evidence about particular officers does not raise a genuine issue of material fact regarding the *City's* liability for its training program—as the City must be the driving force behind the constitutional violation for a *Monell* claim to succeed.  Plaintiffs must present evidence that the City's "improper training . . . 'actually caused' [plaintiffs'] injury."  *Gambrel v. Knox Cnty., Ky.*, 25 F.4th 391, 408 (6th Cir. 2022) (quoting *Connick*, 563 U.S. at 70).  Plaintiffs "cannot hold the municipality liable without proof that proper training would have prevented this force."  *Id.* (citing *Carey v. Helton*, 70 F. App'x 291, 294-95 (6th Cir. 2003) (per curiam)).  Moreover, even if plaintiffs "establish this factual causation, the plaintiff[s] still must show proximate causation—which requires, for example, that

a municipality could reasonably foresee that an employee's wrongful act would follow from the lack of training." *Id*. (citing *Crabbs v. Scott*, 800 F. App'x 332, 338 (6th Cir. 2020)). At the summary judgment stage, plaintiffs must come forward with evidence establishing a genuine, material, factual issue for a jury to decide. *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.). Plaintiffs have not presented any evidence whatsoever on factual causation or proximate causation on their failure to train theory of liability.

Plaintiffs also fail to raise a genuine issue of fact on their failure to supervise theory of liability. "This . . . theory of municipal liability is a rare one. Most agree that it exists and some allege they have seen it, but few actual specimens have been proved." *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010). To do so, plaintiffs must meet "'rigorous standards of culpability and causation' that the Supreme Court has required when a plaintiff claims that a municipality has indirectly caused a violation of federal rights in spite of its 'facially lawful' policies." *Id.* (quoting *Brown*, 520 U.S. at 405, 407).

Plaintiffs fail to meet that standard. Plaintiffs rely on testimony that defendant Jones, who acted as supervisor on the night in question, did not communicate with the other two Officers prior to arriving at 320 Durrell. (Doc. 58 at PAGEID 2048-50). Plaintiffs then list several prior complaints and lawsuits filed against defendant Jones, but plaintiffs do not state the resolution of the complaints. (*Id.*). In addition, though plaintiffs fail to explain the nature of all of the complaints, the ones they do (falsifying information and racial profiling) bear no apparent connection to the alleged excessive force in this case. (*See* Brady Aff., Doc. 49-17 at PAGEID

1896, ¶ 34 ("[T]here are no documented allegations of excessive force against the Officers that were ever found to have been sustained or supported by evidence. . . . I am also not aware or any court, jury, or other panel that found the Officers' use of excessive force to be unconstitutional."). Moreover, Dr. Martinelli's opinion that the Officers were adequately trained and supervised is unrefuted. (Doc. 49-10 at PAGEID 1798). Plaintiffs have failed to raise a genuine issue of material fact with respect to whether the City's supervision of its Officers passed constitutional muster.

For the foregoing reasons, defendants' motion for summary judgment is **GRANTED** as to plaintiffs' *Monell* claims based on the theories of failure to train or failure to supervise.

3.    *Custom, practices, or policies*

Plaintiffs' remaining *Monell* claims are not entirely clear. Plaintiffs highlight Ms. Brady and defendant Batts' testimony that pointing a weapon is not a seizure. (Doc. 58 at PAGEID 2050). Then, plaintiffs cite testimony from Ms. Brady and defendant Warmack, which expresses some lack of recollection about the details of the investigation of this incident. (*Id.* at PAGEID 2051). Then, plaintiffs argue:

> [n]onexistent training in use of force and supervision "is the functional equivalent of a decision by the City itself to violate the Constitution." *City of Canton, Ohio v. Harris,* 489 U.S. 378 at 395-396 (1989) 109 S. Ct. 1197, 103 L. Ed. 2d 412, 57 USLW 4270. WPD policies are generic and inadequate. WPD Search and Seizure policy is inadequate investigations of civil rights violations and nonexistent Burglary policy all created an environment for excessive use of force by officers.

(Doc. 58 at PAGEID 2051-52). Unrefuted testimony by Dr. Martinelli, however, demonstrates that the City's police officers received adequate training. (Martinelli Decl., Doc. 49-10 at PAGEID 1714). Ms. Brady's affidavit lays out a thorough, multi-layered investigation of the

66

incident. (Brady Aff., Doc. 49-17 at PAGEID 1897-99, ¶¶ 39-40). Plaintiffs' claim that the City's policies or customs caused the Officers to violate plaintiffs' rights is essentially a restatement of their failure to train claim. For the reasons discussed above, plaintiffs fail to present evidence creating a genuine issue of fact on this claim. Therefore, defendants' motion for summary judgment is **GRANTED** on plaintiffs' *Monell* claim based on the City's customs, practices, or policies.

      E.     <u>State law claims</u>

Plaintiffs allege a wrongful death claim against the City, defendant Batts, and defendant Jones and a negligence claim against all defendants. Defendants raise a statutory immunity defense to these claims.

To determine whether a political subdivision enjoys immunity under Ohio's Political Subdivision Tort Liability Act (PSTLA), Ohio Rev. Code § 2744 *et seq.*, Ohio courts employ a three-tiered analysis. *Hortman v. Miamisburg*, 852 N.E.2d 716, 718 (Ohio 2006). Courts are to first examine whether the political subdivision falls within the general immunization from liability under Ohio Revised Code § 2744.02(A). *Id.* Courts are to next analyze whether an exception to immunity set out in Ohio Revised Code § 2744.02(B)(1)-(5) applies. *Id.* Finally, courts are to determine whether a defense under Ohio Revised Code § 2744.03 applies to reinstate immunity. *Id.*

There is no dispute that the City is a political subdivision. *See* Ohio Rev. Code § 2744.01(F). Under Ohio Rev. Code § 2744.02(A)(1):

> [T]he functions of political subdivisions are hereby classified as governmental functions and proprietary functions. . . . [A] political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly

67

caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

*Id.* Because the "provision or nonprovision of police . . . services" is a governmental function, the City is generally immune for purposes of the first tier. *Id.* at § 2744.01(C)(2)(a).

Plaintiffs have not presented any evidence showing that one of the five exceptions to immunity applies. Under the second tier, the first exception concerns the negligent operation of a motor vehicle and does not apply. *See id.* at § 2744.02(B)(1). The second exception concerns proprietary functions[24] and does not apply. *See id.* at § 2744.02(B)(2). The third exception concerns the negligent maintenance of public roads and does not apply. *See id.* at § 2744.02(B)(3). The fourth exception concerns negligence related to physical defects on or in public properties and does not apply. *See id.* at § 2744.02(B)(4). The fifth exception concerns instances in which an Ohio statute otherwise expressly imposes liability on a political subdivision and does not apply. *See id.* at § 2744.02(B)(5).

Because the City does not lose its immunity pursuant to any of these exceptions, the third tier is not applicable. Therefore, plaintiffs have not raised a genuine issue of fact showing the City is not immune from plaintiff's state law claims under the PSTLA. *See Hicks*, 2023 WL 3171675, at *7 (municipality found statutorily immune from wrongful death claim).

The Court next turns to the individual Officers' statutory immunity. Ohio Revised Code § 2744.03(A)(6) states that immunity applies to political subdivision employees except in three circumstances:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

---

[24] The definition of proprietary functions (Ohio Rev. Code § 2744.01(G)(1)(a)) excludes functions set forth in Ohio Revised Code § 2744.01(C)(2).

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

*Id.* at §§ 2744.03(A)(6)(a)-(c). Only subsection (A)(6)(b) is remotely at issue. When considering this subsection, the Court may rely on its federal qualified immunity analysis. *See Wright*, 962 F.3d at 878 (quoting *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell*, 585 F.3d at 907 n.1)) ("When federal qualified immunity and Ohio state-law immunity under [Ohio Rev. Code] § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense 'through the lens of federal qualified immunity analysis.'"). If the federal qualified immunity analysis turned on the clearly established prong, however, it is not necessarily dispositive of whether the PSTLA applies to employees. *Wilson v. Gregory*, 3 F.4th 844, 860 (6th Cir. 2021).

Plaintiffs do not articulate their precise theory of liability under this section. But because there is no evidence at all that the Officers' acted in bad faith or with malicious purpose, the Court focuses on whether the Officers acted wantonly or recklessly. Under Ohio law:

Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result. [*Hawkins v. Ivy*, 363 N.E.2d 367, 369 (Ohio 1977)]; *see also Black's Law Dictionary* 1613-1614 (8th Ed. 2004) (explaining that one acting in a wanton manner is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results).

69

> Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. [*Thompson v. McNeill*, 559 N.E.2d 705, 708 (Ohio 1990)], adopting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965); *see also Black's Law Dictionary* 1298-1299 (8th Ed. 2004) (explaining that reckless conduct is characterized by a substantial and unjustifiable risk of harm to others and a conscious disregard of or indifference to the risk, but the actor does not desire harm).

*Anderson v. Massillon*, 983 N.E.2d 266, 273 (Ohio 2012). "These are rigorous standards that will in most circumstances be difficult to establish, especially with respect to a law-enforcement officer carrying out the statutory duty to arrest and detain a person violating the law." *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016).

"[T]he standard for proving recklessness is high, so a court may enter summary judgment in those cases where the conduct does not indicate a disposition to perversity." *Campbell v. Riahi*, 109 F.4th 854, 863 (6th Cir. 2024) (quoting *Caudill v. City of Columbus*, 97 N.E.3d 800, 807 (Ohio Ct. App. 2017)). The Court may also consider the brief nature of the encounter resulting in the use of force. *Caudill*, 97 N.E.3d at 809 (citing *Hayes v. Columbus*, No. 13AP-695, 2014 WL 2048176, at *8 (Ohio Ct. App. 2014) (the court noting it was "mindful" of the fact that deadly force was deployed in the context of an incident lasting only ten seconds)).

Plaintiffs characterize the Officers' actions as "negligent." (Doc. 58 at PAGEID 2043). They do not otherwise develop an argument for why the Officers should meet the significantly higher standard of recklessness—let alone wantonness. The Sixth Circuit has held that summary judgment on statutory immunity may be appropriate even in "arguably close" cases when considering that the individual was acting during a "short, chaotic interval[,]" and where evidence shows that the individual sought to minimize risk—even if he or she did not do so

perfectly.  *Campbell*, 109 F.4th at 863.  Here, the unrefuted evidence from Mr. Gilbertson, an expert on policing, supports the conclusion that the Officers "made at least four (4) objectively reasonable, good faith efforts to deescalate their encounter with [the decedent] before employing deadly force."  (Gilbertson Decl, 49-18 at PAGEID 1903, ¶ 9(d)).  Mr. Gilbertson also opined that the Officers exhibited "remarkable restraint" and proceeded in both the lead up to and use of force in ways that were "consistent with national standards of policing, police practice, and national training trends."  (*Id.*, ¶¶ 9(a), 9(c), and 10).  Plaintiffs have presented no evidence showing the Officers acted either recklessly or wantonly.

For the foregoing reasons, the City and the Officers are entitled to statutory immunity under Ohio law, and defendants' motion for summary judgment is **GRANTED** on plaintiffs' state law claims.

## IV.    Conclusion

For the foregoing reasons, defendants' motions for summary judgment (Docs. 49 and 63) are **GRANTED**.  Plaintiffs' motion for partial summary judgment (Doc. 48) is **DENIED**.

Date:  9/17/2025

Karen L. Litkovitz
United States Magistrate Judge